UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT B. BERGDAHL | ) | |
| Fort Sam Houston | ) | |
| Joint Base San Antonio | ) | |
| San Antonio, TX 28234, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| UNITED STATES | ) | |
| | ) | |
| *Defendant*. | ) | |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(Collateral Review of Court-Martial Conviction)

**Introduction**

This is an action for collateral review of an unconstitutional conviction by a general court-martial. The case raises two basic due process issues: (a) whether the military courts erred in failing to remedy unlawful command influence (UCI) by former President Donald J. Trump and the late Senator John S. McCain, and (b) whether the military judge had a duty to disclose that he had applied for a lucrative job with the Department of Justice (DOJ). The scandalous meddling in a specific case by leaders of the political branches—one of whom was Commander in Chief of the armed forces—would never be tolerated if the proceeding had been a criminal prosecution in this or any other federal district court and should not be tolerated in a court-martial. The circumstances surrounding the second issue are more egregious than those presented in *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019).

1

## Jurisdiction

1. The Court has jurisdiction under 28 U.S.C. § 1331. The federal questions arise under the Due Process Clause of the Fifth Amendment; Rules for Courts-Martial (R.C.M.) 104(a)(1) and 902, which are binding provisions of the *Manual for Courts-Martial, United States*, an Executive Order with the force of law; and Rule 2.11 of the binding Rules of Judicial Conduct for Army Trial and Appellate Judges (May 16, 2008).

## Venue

2. Venue is proper in this district. 28 U.S.C. § 1391(e).

## Parties

3. Plaintiff is a soldier in the U.S. Army.

4. Defendant is the United States.

## Facts

### A

5. In 2016 and 2017, plaintiff was tried by a general court-martial on charges of desertion and misbehavior before the enemy. The gravamen of the offenses was that he went outside the wire at an isolated post in Afghanistan. His intention was to make his way to a higher American headquarters to report what he believed to be poor leadership in his unit. He was abducted almost immediately by the Taliban-affiliated Haqqani Network and held under brutal conditions for nearly five years before being returned to American control in a prisoner exchange that instantly became a political flashpoint.

6. Plaintiff made repeated escape attempts and otherwise comported himself as

required by the Code of Conduct for Members of the Armed Forces of the United States.

7. During the first year of his captivity, the Taliban regularly whipped plaintiff with copper cables, heavy rubber hoses, and the buttstocks of their AK-47 assault rifles; burned the bottom of his feet with matches; and forced him to watch execution videos while threatening to decapitate him.

8. For several months, plaintiff's hands and feet were shackled to a metal bedframe, causing the development of bedsores and resulting in such severe atrophy of his muscles that he could not walk.

9. Eventually, plaintiff's captors detained him in an iron cage where he was shackled for the remaining four years he spent as their prisoner.

10. The cage was approximately six feet wide and seven feet long, was made of quarter-inch iron bars spaced approximately four inches apart on all sides— including on the bottom—and was elevated about eight inches above the ground.

11. The size and construction of the cage made it excruciatingly painful for plaintiff to stand, and impossible to move around.

12. Plaintiff was left to rot inside that cage.

13. This torture exacerbated plaintiff's preexisting mental conditions; as a result, he requires more complicated and more extended medical treatment for his mental health problems.

14. Plaintiff's conviction precludes him from accessing health-care benefits provided by the Department of Veterans Affairs.

15. Plaintiff's treatment in captivity was worse than that experienced by any American captive since the Vietnam War.

16. Upon his return to military custody, plaintiff provided significant intelligence to the Army.

17. The information plaintiff provided was a goldmine that reshaped the Army's understanding of hostage-taking in the region, potentially helping other prisoners of war in Afghanistan.

18. The information plaintiff provided was later incorporated into Army training programs.

19. On October 16, 2017, without waiving his UCI claims and without a pretrial agreement, plaintiff pleaded guilty to misbehavior before the enemy and a one-day desertion, and was convicted in accordance with his pleas.

20. On November 3, 2017, a military judge sentenced plaintiff to a dishonorable discharge, reduction to the lowest enlisted pay grade, and forfeiture of $10,000 in pay and allowances.

21. A dishonorable discharge is highly stigmatizing.

22. On June 4, 2018, the convening authority, an Army general, approved the findings of guilt and the sentence.

23. By a 2-1 vote, the U.S. Army Court of Criminal Appeals (ACCA) thereafter affirmed the findings of guilt and the sentence. *United States v. Bergdahl*, 79 M.J. 512 (Army Ct. Crim. App. 2019).

24. Judge Ewing, dissenting in part, would have (a) found that the convening authority's post-trial action was not free from UCI and (b) set aside plaintiff's

dishonorable discharge. Focusing on a day-of-sentencing tweet in which President Trump called the military judge's sentence "a complete and total disgrace to our Country and to our Military," he concluded that "the timing, specificity, and unequivocal nature of . . . the tweet make it impossible" to say with the requisite certainty that the government had carried its burden of proving beyond a reasonable doubt that an objective, disinterested observer would not "harbor a significant doubt about the fairness" of the proceedings. 79 M.J. at 533 (quoting *United States v. Boyce*, 76 M.J. 242, 248 (C.A.A.F. 2017)). He would have found that the convening authority's post-trial action was not free from apparent UCI, and accordingly would have set aside the dishonorable discharge portion of the sentence. 79 M.J. at 534.

25. By a 3-2 vote, the U.S. Court of Appeals for the Armed Forces (CAAF) affirmed. *United States v. Bergdahl*, 80 M.J. 230 (C.A.A.F. 2020).

26. CAAF Chief Judge Stucky and Judge Sparks, dissenting in part, would have dismissed the charges with prejudice.

27. On October 14, 2020, without hearing or explanation, CAAF denied plaintiff's petition for reconsideration and motion to supplement the record regarding the military judge's DOJ job application (*see* ¶¶ 63(c) & 69 *infra*) without prejudice to his right to seek a writ of error coram nobis from the appropriate court. *United States v. Bergdahl*, 2020 WL 6503139, 2020 CAAF LEXIS 569 (C.A.A.F. 2020) (order).

28. On October 23, 2020, plaintiff filed a coram nobis petition at ACCA.

29. On December 11, 2020, ACCA denied plaintiff's coram nobis petition.

*Bergdahl v. United States*, Dkt. No. ARMY MISC 20200588, 2020 WL 7316058, 2020 CCA LEXIS 443 (Army Ct. Crim. App. Dec. 11, 2020).

30. On December 17, 2020, plaintiff filed a writ-appeal petition at CAAF seeking review of ACCA's denial of his coram nobis petition.

31. On February 2, 2021, CAAF denied the writ-appeal petition without hearing or explanation of any kind. *Bergdahl v. United States*, No. 21-0091/AR (C.A.A.F. Feb. 2, 2021).

**B**

32. UCI was the basis for three motions to dismiss during plaintiff's court-martial, one arising from words and deeds of Senator McCain and two arising from words and deeds of former President Trump.

33. UCI violates due process of law.

34. The doctrine of apparent UCI vindicates the strong interest in fostering public confidence in the military justice system.

35. Once apparent UCI has been shown, the burden is on the prosecution to prove beyond a reasonable doubt that an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceedings.

36. The observer is deemed to be a member of the general public.

**C**

37. The Senate Armed Services Committee (SASC) has jurisdiction over military budgets and personnel, including, as the Standing Rules of the Senate provide, "[p]ay, promotion, retirement, and other benefits and privileges of members

of the Armed Forces." Officer promotions requiring Senate confirmation come before SASC prior to floor action.

38. Senator McCain's leadership position gave him unique sway over the military.

39. Three days after plaintiff's return from captivity, Senator McCain announced his displeasure with the prisoner exchange deal: "this decision to bring [him] home–and we applaud that he is home–is ill-founded . . . it is a mistake, and it is putting lives of American servicemen and woman [*sic*] at risk. And that to me is unacceptable." He also stated, "I would not have made this deal . . . . I would not have put the lives of American servicemen at risk in the future.".

40. While it considered whether, contrary to DoD policy dating to the Vietnam Era, to charge a returning POW who had behaved properly in captivity, the Army came under intense pressure from Senator McCain to do just that: in 2014 and early 2015, his staff repeatedly pressed the Army concerning its charging decision making, demanding information on plaintiff's pay status, captivity-related pay, and other entitlements, closely monitoring the pretrial processing of the charges against plaintiff, and requiring regular progress reports.

41. On March 23, 2015, the SASC general counsel requested to know "by close of business" when the U.S. Army Forces Command, to which the Army had referred plaintiff's case for disciplinary action, would announce action on the charges.

42. Two days later, charges were preferred against plaintiff, and the Army immediately notified SASC.

43. In May 2015, SASC pressed for information about the preliminary hearing that is a precondition to a general court-martial.

44. In June 2015, Senator McCain told the *Army Times* newspaper that SASC, which he chaired, would begin an "official examination" of plaintiff's case "as soon as the final decision is rendered."

45. At the preliminary hearing, the Army general who had conducted an extensive investigation and interviewed plaintiff at length testified that confinement "would be inappropriate."

46. The hearing officer, a uniformed Army attorney, recommended that the charges be referred to a misdemeanor-level special court-martial not empowered to adjudge even a bad-conduct discharge, much less a dishonorable discharge, and observed that neither confinement nor a punitive discharge was warranted.

47. Senator McCain reacted swiftly by stating, "If it comes out that [plaintiff] has no punishment, we're going to have to have a hearing in the Senate Armed Services Committee," adding that plaintiff–as to whom charges had not even been referred–"is clearly a deserter."

48. SASC demanded updates on the referral decision throughout October and November 2015.

49. On December 9, 2015, the House Armed Services Committee (HASC) chimed in, noting in a published official report on the 2014 detainee transfer through which plaintiff was liberated that it would "remain abreast of the disciplinary process which is underway."

50. Neither the Constitution nor the UCMJ afford SASC and HASC any role in the administration of justice in individual pending courts-martial.

**D**

51. Before and during the 2016 presidential campaign, candidate Trump repeatedly vilified plaintiff, describing him as a traitor at numerous rallies, and suggesting, among other things, that he should be executed. A video compendium of his disparaging comments is in the court-martial record of trial and is available online through the YouTube service at https://www.youtube.com/watch?v=S2MJeMm950M.

52. On November 3, 2017, immediately after plaintiff was sentenced and before the convening authority acted on the record of trial—and in direct contravention of R.C.M. 104(a)(1)—President Trump tweeted: "The decision on Sergeant Bergdahl is a complete and total disgrace to our Country and to our Military."

53. The convening authority had to review the record of trial and in doing so had unfettered discretion to disapprove plaintiff's conviction, sentence, or both, in whole or in part, for any reason or for no reason.

54. President Trump continued to publicly disparage plaintiff while the case was pending review by ACCA.

55. In ruling that President Trump and Senator McCain had not placed an undue strain on public confidence in the military justice system and that the prosecution had carried its burden of proof beyond a reasonable doubt, CAAF—

(a)     imputed to the objective, disinterested observer information that a

member of the general public would not know; and

(b)    determined in the absence of evidence that no convening authority would have granted post-trial clemency notwithstanding strong mitigating evidence.

**E**

56. Plaintiff's court-martial was presided over by Jeffery R. Nance, an Army colonel and military judge.

57. Military judges are subject to challenge for cause.

58. Military judges have an affirmative duty to disclose matters that might be the basis for a challenge for cause. R.C.M. 902; *see also* Rules of Judicial Conduct for Army Trial and Appellate Judges, R. 2.11 [cmt] (May 16, 2008).

59. On January 12, 2016, in response to *voir dire* questions by the defense, Judge Nance stated that he had a mandatory retirement date of November 2018 and was unaware of any matter that might be grounds for challenging him.

60. On January 20, 2017, Mr. Trump became President of the United States and *ex officio* Commander in Chief of the armed forces.

61. After President Trump took the oath of office, plaintiff moved to dismiss on the basis of his apparent UCI.

62. On February 24, 2017, Judge Nance denied plaintiff's motion.

63. Three events pertinent to this action occurred on October 16, 2017—

(a) Judge Nance accepted plaintiff's guilty pleas.

(b) Shortly thereafter, President Trump stated, in the course of a Rose Garden news conference with then Senate Majority Leader Mitch McConnell: "Well,

I can't comment on Bowe Bergdahl because he's—as you know, they're—I guess he's doing something today, as we know. And he's also—they're setting up sentencing, so I'm not going to comment on him. But I think people have heard my comments in the past." (CAAF later found that "[t]he last sentence of this statement was a ratification of, and served to incorporate by reference, the comments Mr. Trump had previously made on the campaign trail regarding [plaintiff]'s case." 80 M.J. at 238.)

(c) Judge Nance applied to DOJ to be an immigration judge. His application highlighted the fact that he was the "presiding judge in U.S. v. SGT Robert Bergdahl . . . [and] [s]uffice it to say, it has received significant national and international media attention and involves many complex issues." The writing sample he submitted was his February 24, 2017 ruling denying plaintiff's January 20, 2017 UCI motion. The record does not reveal whether he submitted his application package before or after he accepted plaintiff's pleas.

64. As an executive department, DOJ is under the President's control and overall supervision. One of its core functions is to prosecute federal criminal cases in the district courts.

65. Hiring decisions for immigration judges are discretionary and appointments are made personally by the Attorney General. The Attorney General is a member of the Cabinet, serves at the pleasure of the President, and advises the President on all matters arising under the laws of the United States, including military justice matters such as changes to the *Manual for Courts-Martial* and clemency.

66. Immigration policy was one of President Trump's signature policies.

67. On October 17, 2017, plaintiff filed a renewed UCI motion based on President Trump's Rose Garden ratification, the day before, of his pre-Inauguration disparaging comments.

68. On October 23, 2017, Judge Nance conducted a hearing on the renewed UCI motion. On *voir dire* by the trial counsel (the military prosecutor), he stated: "I'm what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement pastures. And that's in almost a year from now." Regarding his susceptibility to outside influence, he said: "So that's a long way of saying, 'No, no effect on me whatsoever.' I don't expect to go anywhere but back home as soon as the Army is done with me in a year."

69. Judge Nance did not disclose that, only a week before, he had applied for a position with DOJ; that his application had highlighted his role in plaintiff's case; and that he had made his denial of plaintiff's January 20, 2017 UCI motion a centerpiece of his application.

70. On October 30, 2017, Judge Nance denied plaintiff's renewed UCI motion. He found as a fact that while plaintiff had elected trial by judge alone, and that President Trump was Commander in Chief over all of the military, including himself, "I have no hope for or ambition for promotion beyond my current rank. . . . I am completely unaffected by any opinions President Trump may have about SGT Bergdahl. . . . As far as I know, President Trump has never said anything about me as a military judge or otherwise." He concluded that the government had met its evidentiary burden of proving beyond a reasonable

doubt that President Trump's statements did not create an intolerable strain on public confidence in the military justice system and that an objective, informed observer would not harbor a significant doubt about the fairness of the proceedings. In support of this conclusion, he wrote: "The evidence establishes beyond a reasonable doubt that I . . . hold no fear of any repercussions from anyone if they do not agree with my sentence in this case."

71. Judge Nance sentenced plaintiff on November 3, 2017 and authenticated the record of trial on April 28, 2018.

72. Sometime between October 16, 2017 and September 28, 2018 DOJ hired Judge Nance. Its September 28, 2018 press release stated in part, "Attorney General Jeff Sessions appointed Jeffery R. Nance to begin hearing cases in October 2018."

73. Judge Nance retired from the Army on November 1, 2018, without ever disclosing to the defense that he had applied for a position as an immigration judge.

74. Immigration judges earn over $100,000 per year.

## Causes of Action

## Count I (UCI)

75. The averments of ¶¶ 1-55 are incorporated herein by reference.

76. The Due Process Clause applies to courts-martial.

77. Both President Trump and Senator McCain grossly abused their official authority.

78. Because CAAF mistakenly found that the government had carried its UCI

burden of proof beyond a reasonable doubt and that an intolerable strain had not been placed on public confidence in the administration of justice, plaintiff's conviction and sentence violated due process and are invalid.

### Count II (Failure to Disclose Ground for Disqualification)

79. The averments of ¶¶ 1-31 and 56-74 are incorporated herein by reference.

80. Judge Nance had a duty to disclose his DOJ job application and a duty in any event not to mislead plaintiff about his future plans.

81. By failing to disclose his job application and indicating that he was simply going to retire, and then citing that as a basis for denying the renewed UCI motion, Judge Nance—

   (a) concealed a material financial interest;

   (b) thwarted plaintiff's opportunity to conduct *voir dire*, challenge him for cause, reconsider his pleas and decision to waive trial by jury; and thereby

   (c) denied him a fair trial before an impartial judge as guaranteed by the Fifth Amendment.

82. Because plaintiff's conviction and sentence violated due process and R.C.M. 902, they are invalid.

### Relief Requested

83. Plaintiff prays that the Court enter judgment—

   (a) declaring that his conviction and sentence were obtained in violation of the Fifth Amendment, R.C.M. 104(a)(1) and 902, and Rule 2.11 of the Rules of Judicial Conduct for Army Trial and Appellate Judges;

   (b) ordering that his conviction and sentence be expunged and that all

rights, privileges, and property of which he has been deprived by reason of

the conviction be restored; and

(c) granting such other and further relief as may in the circumstances be just

and proper.

Respectfully submitted,

/s/ *Eugene R. Fidell*
EUGENE R. FIDELL
D.C. Bar No. 112003
Feldesman Tucker Leifer Fidell LLP
1129 20th St., N.W., Suite 400
Washington, DC 20036
(202) 256-8675 (mobile)
efidell@feldesmantucker.com

/s/ *Franklin D. Rosenblatt*
FRANKLIN D. ROSENBLATT
D.C. Bar No. 1600851
Butler Snow LLP
1020 Highland Colony Pkwy. #1400
Ridgeland, MS 39157
(601) 985-4494
franklin.rosenblatt@butlersnow.com

/s/ *Stephen A. Saltzburg*
STEPHEN A. SALTZBURG
D.C. Bar No. 370949
2000 H St., N.W.
Washington, DC 20052
(202) 994-7089
ssaltz@law.gwu.edu

/s/ *Stephen I. Vladeck*
STEPHEN I. VLADECK
D.C. Bar No. 988509
727 E. Dean Keeton St.
Austin, TX 78705
(512) 475-9198
svladeck@law.utexas.edu

15

/s/ *P. Sabin Willett*
P. SABIN WILLETT
Morgan, Lewis & Bockius LLP
One Federal St.
Boston, MA 02110-1726
(617) 951-8775
sabin.willett@morganlewis.com

*Attorneys for Plaintiff*

February 17, 2021

Serve: Attorney General of the United States
United States Attorney for the District of Columbia
Secretary of the Army

16