**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ROBERT B. BERGDAHL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:21-CV-00418 (RBW) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

BACKGROUND – MILITARY JUSTICE SYSTEM .................................................................. 5

FACTUAL BACKGROUND ....................................................................................................... 6

    A.     Investigation and Charges .................................................................................... 6

    B.     Court Martial Proceedings .................................................................................. 7

          1.     First and Second UCI Motions .................................................................. 8

          2.     Guilty Plea, Providence Inquiry, and Acquittal as to Desertion after June 30, 2009 ......................................................................................... 10

          3.     Third UCI Motion .................................................................................. 13

          4.     Sentencing ............................................................................................... 15

               a.     Aggravation Evidence .................................................................. 15

                    i.     Recovery Operations, Generally ....................................... 15

                    ii.     Servicemembers Injured in Recovery Operations ........... 16

               b.     Mitigation Evidence .................................................................... 18

               c.     Argument and Sentence ................................................................ 19

    C.     Post-Conviction Review by Military Appellate Courts ....................................... 20

ARGUMENT .............................................................................................................................. 21

I.     Legal Standards .................................................................................................................. 21

    A.     Standard on a Motion to Dismiss for Failure to State a Claim ............................ 21

    B.     Limitations on Collateral Review of Court-Martial Convictions ........................ 22

II.    The Court Should Dismiss Plaintiff's Claim of Unlawful Command Influence. ............. 23

    A.     The Military Courts Exhaustively Considered Plaintiff's Claims of Unlawful Command Influence. .......................................................................... 24

    B.     The Military Courts Correctly Concluded that an Objective, Disinterested Observer Fully Informed of All the Facts and Circumstances Would Not Harbor a Significant Doubt about the Fairness of These Proceedings. ............... 24

1.  In Alleging that the CAAF Imputed to the Objective, Disinterested Observer Information that a Member of the General Public Would Not Know, Plaintiff Urges a Standard Contrary to the Express Language of the Applicable Test. ............................................................ 25

2.  Plaintiff Errs in Arguing that the CAAF "Determined in the Absence of Evidence that No Convening Authority Would Have Granted Post-Trial Clemency Notwithstanding Strong Mitigating Evidence." ....................................................................................................... 27

II. The Court Should Dismiss Plaintiff's Claim Grounded in the Military Judge's Employment Application. ................................................................................................. 34

 A. The Military Court Thoroughly Considered Plaintiff's Claim that the Military Judge Failed to Disclose a Basis for Disqualification. ........................... 34

 B. There Are No Grounds on Which to Disturb the Military Court's Determination that Plaintiff Effectively Waived the Issue of the Military Judge's Employment Application by Waiting Nearly Two Years After the Public Announcement of his Employment to Raise the Issue. ............................. 36

 C. Count II Also Fails on Its Merits. ........................................................................ 37

  1.  Legal Standard ......................................................................................... 38

  2.  This Case Is Distinguishable from *Al-Nashiri*, and an Objective Observer Knowing all the Circumstances Would Not Question the Military Judge's Impartiality. .................................................................... 38

   a.  Plaintiff Errs in Analogizing to *Al-Nashiri*. ................................... 39

   b.  The Military Judge's Actions Supply No Reason to Question his Impartiality. .............................................................. 41

    i.  Employment Application ................................................. 41

    ii.  Further Evidence of Independence ................................. 42

    iii.  Conduct of the Court-Martial ........................................ 43

    iv.  Outcome of the Court-Martial ....................................... 44

CONCLUSION ........................................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... 21

*\*Bergdahl v. United States*,
  2020 WL 7316058 (A. Ct. Crim. App. Dec. 11, 2020) .................................... passim

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ...................................................................................... 31

*Burkes v. Holder*,
  953 F. Supp. 2d 167 (D.D.C. 2013) ................................................................ 21

*\*Burns v. Wilson*,
  346 U.S. 137 (1953) ...................................................................................... passim

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ........................................................................ 21

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) ........................................................................................ 6

*Hamdi v. Rumsfeld*
  542 U.S. 507 (2004)........................................................................................ 31

*Homcy v. Resor*,
  455 F.2d 1345 (D.C. Cir. 1971) ...................................................................... 28

*\*In re Al-Nashiri*,
  921 F.3d 224 (D.C. Cir. 2019) ........................................................................ passim

*Middendorf v. Henry*,
  425 U.S. 25 (1976) ........................................................................................ 23

*Oppermann v. United States*,
  2007 WL 1748920 (D.D.C. June 15, 2007) ...................................................... 34

*Ortiz v. United States*,
  138 S. Ct. 2165 (2018) .................................................................................. 5, 6

*Priest v. Sec'y of Navy*,
   570 F.2d 1013 (D.C. Cir. 1977) .............................................................. 22

*Sanford v. United States*,
   567 F. Supp. 2d 114 (D.D.C. 2008) ........................................................ 34

*\*Sanford v. United States*,
   586 F.3d 28 (D.C. Cir. 2009) ............................................................. 22, 23

*\*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) .................................................................... 5, 6, 22

*Scott v. United States*,
   351 F. Supp. 3d 1 (D.D.C. 2018) ................................................ 10, 21, 22, 28

*Turner v. Spencer*,
   335 F. Supp. 3d 72 (D.D.C. 2018) ........................................................... 25

*U.S. v. Bergdahl*,
   80 M.J. 362 (C.A.A.F. 2020) ............................................................. 20, 34

*U.S. ex rel. New v. Rumsfeld*, *("New I")*
   350 F. Supp. 2d 80 (D.D.C. 2004) ....................................................... 21, 23

*United States ex rel. New v. Rumsfeld*, (*"New II"*)
   448 F.3d 403 (D.C. Cir. 2006) .............................................................. 22

*United States v. Benavides*,
   57 M.J. 550 (A.F. Ct. Crim. App. Jun. 13, 2002) ........................................... 32

*United States v. Bergdahl*,
   79 M.J. 512 (Army Ct. Crim. App. Jul. 16, 2019) ....................................... 2, 20

*\*United States v. Bergdahl*,
   80 M.J. 230 (C.A.A.F. 2020) ........................................................... passim

*\*United States v. Boyce*,
   76 M.J. 242 (C.A.A.F. 2017) ........................................................... passim

*United States v. Denedo*,
   66 M.J. 114 (C.A.A.F. 2008) ................................................................ 35

*United States v. Etibek*,
   2007 WL 7263001 (Army Ct. Crim. App. Mar. 29, 2007) ..................................... 32

*United States v. Kincheloe,*
　14 M.J. 50 (C.M.A. 1982) ................................................................. 38

*United States v. Lemburg,*
　2018 WL 4440397, (A.F. Ct. Crim. App. Aug. 30, 2018) ...................... 31

*Unites States v. Lewis*
　63 M.J. 405 (C.A.A.F. 2006) ............................................................ 26

*United States v. Martinez,*
　70 M.J. 154 (C.A.A.F. 2011) ............................................................ 38

*United States v. Morgan,*
　346 U.S. 502 (1954) ........................................................................ 35

*United States v. Quintanilla,*
　56 M.J. 37 (C.A.A.F. 2001) ......................................................... 38, 45

*United States v. Roane,*
　43 M.J. 93 (C.A.A.F. 1995) .............................................................. 10

*\*United States v. Snyder,*
　2020 WL 1896341 (A.F. Ct. Crim. App. Apr. 15, 2020), *review denied by* 80 M.J. 399,
　(C.A.A.F. 2020), *reconsideration denied by* 81 M.J. 136 (C.A.A.F. 2021) ...................... 39, 40

*United States v. Sullivan,*
　74 M.J. 448 (C.A.A.F. 2015) ........................................................ 37, 38

*United States v. Swanholm,*
　36 M.J. 743 (A.C.M.R. 1992) ........................................................... 32

*United States v. Wert,*
　2010 WL 4069039 (A.F. Ct. Crim. App. Jan. 19, 2010) .......................... 32

*\*United States v. Wilson,*
　2021 WL 2390367 (A.F. Ct. Crim. App. June 10, 2021) ..................... 39, 40

*Unites States v. Maury,*
　2004 WL 2191714 (A.F. Ct. Crim. App. Sep. 14, 2004) .......................... 32

*Walters v. Sec'y of Def.,*
　725 F.2d 107 (D.C. Cir. 1983) .......................................................... 23

*Weil v. Markowitz,*
　829 F.2d 166 (D.C. Cir. 1987) .......................................................... 21

**Constitution**

U.S. Const. art. I, § 8, cl. 14 .................................................................................. 5

**Statutes**

10 U.S.C. § 816 ........................................................................................................ 5

10 U.S.C. § 818 ........................................................................................................ 5

10 U.S.C. § 856a ...................................................................................................... 5

10 U.S.C. § 858a ................................................................................................. 19, 45

10 U.S.C. § 866 ........................................................................................................ 5

10 U.S.C. § 885 ........................................................................................................ 7

10 U.S.C. § 899 ........................................................................................................ 7

10 U.S.C. § 941 ........................................................................................................ 6

10 U.S.C. § 942 ........................................................................................................ 6

Authorization for Use of Military Force,
  Pub. L. 107-40, 115 Stat. 224 (Sept. 18, 2001) ................................................. 31

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 21

R.C.M. 902 ............................................................................................................. 37

R.C.M. 1001 ........................................................................................................... 30

**Regulations**

Army Reg. 27-10 ................................................................................................ 20, 45

**INTRODUCTION**

Plaintiff Robert B. Bergdahl (hereinafter "Plaintiff" or "Mr. Bergdahl"), who pleaded guilty before a military court-martial to desertion and misbehavior before the enemy, and who requested and received a dishonorable discharge, now seeks to collaterally attack his conviction and sentence before this Court.  But Plaintiff ignores the high bar that such a collateral attack must clear, and the claims he brings—allegations of unlawful command influence and of failure to disclose grounds for disqualification—are unavailing on their own terms.

For non-custodial plaintiffs such as Mr. Bergdahl, a collateral attack on a court-martial conviction is barred unless the district court determines that the military tribunal's judgment was void due to a fundamental error in the tribunal's decision-making.  Under Supreme Court and D.C. Circuit precedent, that requires, at a minimum, a finding that the military court failed to fully and fairly consider the plaintiff's claims.  Both of Mr. Bergdahl's claims have already been litigated in the military justice system, and both received careful, fulsome, and fair consideration from the military courts.

Mr. Bergdahl's claims of unlawful command influence were considered, and rejected, three times by the military judge presiding over his court-martial, and they were rejected another five times by military courts of appeal.  During court-martial proceedings, Mr. Bergdahl brought three motions based on alleged unlawful command influence, first based on statements by Senator McCain, and then on remarks by President Trump.  The parties offered over two hundred pages of briefing and exhibits, and extensive argument on the allegations, and the military judge issued three carefully-reasoned decisions rejecting Mr. Bergdahl's claims.  In reaching those decisions, the judge squarely addressed the remarks that formed the basis of Mr. Bergdahl's allegation—characterizing Senator McCain's statements as "ill-advised," and criticizing the President's comments as "troubling," "disturbing," and "disappointing"—and made clear that he would not let their concerning content influence the proceedings.  Indeed, with respect to President Trump's remarks, the military judge wrote, "The Court will take special

- 1 -

care to ensure that comments by Mr. Trump do not invade this trial."  And he ultimately considered the comments as mitigation evidence in sentencing.

While his court-martial was pending, Mr. Bergdahl petitioned the Army Court of Criminal Appeals ("ACCA") and then the Court of Appeals for the Armed Forces ("CAAF")— the military's highest court, comprised of civilian judges who are structurally insulated from military influence—for a writ of mandamus seeking relief from the military judge's order concluding that Senator McCain's comments did not constitute unlawful command influence. Both the ACCA and the CAAF denied Mr. Bergdahl's petitions.

After his conviction and sentencing, Mr. Bergdahl appealed to the ACCA, which issued a thoughtful opinion assessing and rejecting his claims of unlawful command influence, and Mr. Bergdahl then appealed again to the CAAF.  The CAAF conducted a searching review and "conclude[d] that a finding of apparent unlawful command influence [was] not warranted." *United States v. Bergdahl*, 80 M.J. 230, 239 (C.A.A.F. 2020).  The CAAF's conclusion was "predicated on all of the relevant facts of this case, regardless of whether the various stages of the court-martial proceedings [were] viewed individually or cumulatively." *Id.*  Having carefully considered the facts at each stage of the proceedings, the CAAF found that:  "regardless of how 'troubling,' 'disturbing,' 'disappointing,' 'inaccurate,' 'inappropriate' and 'ill-advised'" public officials' comments regarding Mr. Bergdahl's case may have been, *id.* at 244 (quoting *United States v. Bergdahl*, 79 M.J. 512, 519, 527, 522 (2019) and Tr. at 579:8), the outcome in this case "stands as a testament to the strength and independence of the military justice system."  *Id.* at 244.  A detailed discussion of the CAAF's analysis follows herein, but even a cursory examination of the facts illustrates why that is so.

On July 30, 2009, Mr. Bergdahl was a Private First Class in the Army, stationed at Observation Post Mest, Afghanistan.  He was assigned to guard duty the next morning, and scheduled to participate in a possible convoy to a nearby forward operating base.  Instead, he chose to leave.  In so doing, Mr. Bergdahl intended to cause a DUSTWUN—"Duty Status Whereabouts Unknown"—alert, called when a servicemember disappears in theater.  As Mr.

- 2 -

Bergdahl explained, he knew that if such an alert were issued, the call would go out to every service; as he put it: "that call goes not only all the way up to Army command, it goes to Air Force, it goes to Marines.  It goes all the way back to the states.  It goes to every high point and everybody finds out about it."  Within hours of his departure, Mr. Bergdahl had been captured by the Taliban, and the DUSTWUN alert he intended had gone out.

Responding to that alert, thousands of servicemembers risked their lives to try to save his. The Amended Complaint describes in detail the hardship that Mr. Bergdahl endured at the hands of the Taliban, *see* Am. Compl., ECF No. 3, ¶¶ 5, 7–13, 15, but does not acknowledge the sacrifices of those servicemembers who were gravely injured in the dangerous, desperate rescue operations triggered by his decision.  During the course of that grueling effort, many got sick. Some sustained serious, life-altering injuries.  Then-Corporal Jonathan Morita was shot in his dominant hand with a rocket-propelled grenade.  Senior Chief James Hatch was shot in the leg at close range with an AK-47, shattering his femur, and requiring eighteen follow up surgeries. Master Sergeant Mark Allen was shot in the head, requiring over a dozen surgeries.  He was left suffering chronic pain for the rest of his life, unable to speak, interact with his children, or perform any basic life functions for himself.

At his court-martial, Mr. Bergdahl acknowledged his role in bringing about these consequences.  He explained that "[s]aying the words 'I'm sorry' is not enough . . . . [o]ffering condolences isn't enough . . . . I can only hope that my accepting responsibility for my mistake . . . can help."  Verbatim Record of Trial, Ex. 1 hereto, ("Tr.") at 2155:1, 9–11.[1]  He pleaded guilty to desertion and misbehavior before the enemy, both very serious offenses.  *Bergdahl*, 80 M.J. at 239.  As the CAAF noted:  "after his guilty plea, and *fully aware of his own case in mitigation,* [Mr. Bergdahl] *specifically recognized that he was deserving of punishment and asked to have a dishonorable discharge imposed upon him.*"  *Id.* at 243 (emphasis the Court's). And although the prosecution argued for 14 years confinement at sentencing, the military judge

---

[1] This transcript and the other exhibits submitted herewith have been redacted to protect sensitive information listed in Federal Rule of Civil Procedure 5.2.

imposed no prison time, opting instead to order the dishonorable discharge Mr. Bergdahl had

requested, along with a reduction in Mr. Bergdahl's grade and forfeiture of some of his pay.

The military judge's approach to sentencing was one of many instances during the court-

martial where the judge made clear he was not subject to outside influence.  In rejecting Mr.

Bergdahl's allegations of apparent unlawful command influence, the CAAF underscored that:

> despite the sensational nature of this case, despite the public calls for the lengthy
> imprisonment of [Mr. Bergdahl], despite Senator McCain's threat that he would
> hold a hearing if [Mr. Bergdahl] did not receive a sentence to his liking, and despite
> the Commander in Chief's ratification of his statements that [Mr. Bergdahl] was a
> traitor who should be severely punished, the military judge imposed on [Mr.
> Bergdahl] *no prison time whatsoever*.

*Id.* at 244 (emphasis the Court's).

On these facts, the CAAF concluded that "an objective disinterested observer would

conclude than rather than being swayed by outside forces, the military judge was notably

impervious to them."  *Id.*  As discussed further herein, the CAAF reached this holding upon full

and fair consideration of Mr. Bergdahl's claims, and there is no flaw—fundamental or

otherwise—in that court's reasoning that could support disturbing its decision.  Especially in

light of the deference due the CAAF's judgments, heightened when that court addresses "areas

of law peculiar to the military branches" such as unlawful command influence, this Court should

dismiss Count I.

Mr. Bergdahl's second claim, that the military judge improperly failed to disclose his

application for employment as an immigration judge with the Department of Justice (DOJ), is

likewise without merit.  To begin with, the ACCA fully and fairly considered this issue and

found that Mr. Bergdahl had effectively waived it by failing to raise the issue for almost two

years after the military judge's employment with DOJ was publicly announced.  For this reason

alone—and because there is no flaw rendering that court's decision void—any further review of

Mr. Bergdahl's second claim is barred.

Moreover, Count II would fail on the merits even if it were otherwise not barred.

Although Mr. Bergdahl relies on *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019), to frame his

claim that the military judge had a duty to disclose his employment application, the judge in *Al-Nashiri* had applied for employment with DOJ while presiding over a military commission case *in which DOJ was a party*.  No such circumstances arose in Mr. Bergdahl's court-martial, and two cases have already declined to extend *Al-Nashiri* to court-martial proceedings where DOJ had no role.  Moreover, throughout the proceedings—including in the very decision appended to his employment application—the military judge demonstrated his independence.  Following the issuance of that decision, even Mr. Bergdahl's counsel opined that "the White House . . . was long aware of the dim view the Court took of President Trump's pre-inauguration statements about Sergeant Bergdahl."  As the CAAF's thorough analysis has already concluded, there is no basis on which an objective, disinterested observer could question the fairness and independence of this military judge.

        For all these reasons, explained further herein, Defendant respectfully requests that the Court dismiss the Amended Complaint.

## BACKGROUND – MILITARY JUSTICE SYSTEM

        The Constitution grants to Congress the authority "[t]o make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14.  Exercising that authority, "Congress has taken great care both to define the rights of those subject to military law, and provide a complete system of review within the military system to secure those rights." *Burns v. Wilson*, 346 U.S. 137, 140 (1953).  As the Supreme Court explained, courts-martial are "subject to several tiers of appellate review, thus forming part of an integrated 'court-martial system' that closely resembles civilian structures of justice."  *Ortiz v. United States*, 138 S. Ct. 2165, 2170 (2018).  The military court system "begins with the court-martial itself, an officer-led tribunal convened to determine guilt or innocence and levy appropriate punishment, up to lifetime imprisonment or execution."  *Id.* at 2171 (citing 10 U.S.C. §§ 816, 818, 856a).

        A decision by a military judge in court-martial proceedings may be reviewed by an appellate court created by Congress to serve that function.  *See Schlesinger v. Councilman*, 420 U.S. 738, 746 (1975) (noting Congress has never "conferred on any Art. III court jurisdiction

directly to review court-martial determinations"). The next phase of military justice occurs at a service-specific appellate court, here, the ACCA. *Ortiz*, 138 S. Ct. at 2171 (citing 10 U.S.C. §§ 876(a)–(c)). At the highest level of the court-martial system is the Court of Appeals for the Armed Forces (CAAF), a court "structural[ly] insulat[ed] from military influence," *Hamdan v. Rumsfeld*, 548 U.S. 557, 587–88 (2006), comprised of five civilian judges each appointed to serve 15-year terms, *see Ortiz*, 138 S. Ct. at 2171 (citing 10 U.S.C. §§ 941, 942(a)–(b)).

## FACTUAL BACKGROUND

### A. Investigation and Charges

In 2014, the United States Army conducted an administrative fact-finding investigation into Mr. Bergdahl's disappearance. During a lengthy interview with Major General Kenneth R. Dahl, the investigating officer, Mr. Bergdahl explained that, having perceived what he thought to be problems in his unit, he intended to cause a DUSTWUN alert. *See* Tr. of Interview with MG Dahl, Ex. 2 hereto, at 121:5–124:12; 139:19–23 (agreeing that "[if] [y]ou go DUSTWUN, everything shows up"; "The [Intelligence, Surveillance and Reconnaissance] shows up; the [Special Operations Forces] guys show up; the special ops; the black [ops] guys show up."); *id.* at 172:5–21. His plan was to reappear at Forward Operating Base Sharana, and demand a meeting with a general officer, on the assumption that a general would be interested to know why he has caused a DUSTWUN and taken such great risks with his personal safety. *See id.*; *see also id.* at 134:18–136:20; 138:2–17 (agreeing with the summary "if I go DUSTWUN, I'm going to get my opportunity to talk to a general"); 139:14–16.[2] Major General Dahl found that Mr. Bergdahl had deserted with the intent to shirk important service, and that he had deliberately triggered a DUSTWUN event. *See* Investigation into PFC Bergdahl's Disappearance, Ex. 3 hereto, at 1, 34–37. Major General Dahl further concluded that while Mr. Bergdahl's stated motive was "well-meaning in his mind," that did not "negate the elements of proof required to reach a finding of desertion." *Id.* Major General Dahl recommended providing the results of his

---

[2] Mr. Bergdahl also referred to his desire to be part of the Special Forces as part of his reasoning in why he chose to leave OP Mest, reasoning that the skills he planned to demonstrate would help him to be accepted into Special Forces. Ex. 2 at 130:5–132:22.

investigation to Mr. Bergdahl's General Court-Martial Convening Authority (GCMA) "for whatever action, if any, the GCMA deems appropriate." *Id.* at 45.

On March 25, 2015, charges, including desertion with intent to avoid hazardous duty or shirk important service, and misbehavior before the enemy, *see* 10 U.S.C. §§ 885, 899, were preferred against Mr. Bergdahl.[3]  The preliminary hearing officer recommended that Mr. Bergdahl's case be referred to a special court-martial not empowered to sentence him to a bad-conduct discharge, noting that the "strongest factor" supporting that recommendation was that he lacked any evidence "demonstrating that anyone was killed or wounded" during the effort to recover Mr. Bergdahl.  He noted, however, that "the issue of casualties should be conclusively addressed prior to a final decision on the disposition of SGT Bergdahl's case." *Bergdahl*, 80 M.J. at 240 (quoting preliminary hearing report).  (In fact, as described herein, individuals were injured during the recovery effort.)  Ultimately, the GCMA referred the charges against Mr. Bergdahl to a general court-martial.

**B. Court Martial Proceedings**

Court-martial proceedings began in Plaintiff's case on December 22, 2015, and included extensive discovery and litigation over numerous pretrial issues.  Throughout the proceedings, the military judge sought to alleviate the burdens of discovery on the defense.  When the defense expressed concerns about the volume of materials produced in discovery, the judge instructed:

> What I want the government to do as officers of the court is to say to the defense, 'Okay. Here is this document. It's a hundred pages long. There are two pages in it that we believe are relevant to your client. These are the two pages . . . so that they aren't just stumbling around in the dark looking at a hundred pages, trying to figure out which ones you -- why you gave them these hundred pages.

Tr. at 411:3–11, 20–21; *see also, e.g.*, *id.* at 126:1–127:10 (ordering prosecution to provide an index of produced documents because "[i]t would be more time consuming for the defense to try to go back and to find the needle in the haystack."); *id.* at 154:1–17, 155:4–6 (ordering the

---

[3]  "Preferral of charges" refers to the initiation of charges within the court-martial system, when a person signs charges and specifications under oath.  *See* R.C.M. 307(b); 10 U.S.C. § 830.  Referral, on the other hand, is "the order of a convening authority that charges and specifications against an accused will be tried by a specified court-martial."  R.C.M. 601(a); 10 U.S.C. § 834(d).

prosecution to inform the defense which materials they had marked as "hot docs").  When the defense expressed concern over the then-scheduled trial date, the judge assured them: "I'm going to extend [the timeline] whatever amount of time you need."  *Id.* at 554:14–16.[4]  Likewise, he was careful to provide the defense ample opportunity to raise any issue that they sought to have addressed.  *See*, *e.g*, *id.* at 343:13–15 ("[e]ven though the time for addressing those issues has passed, I'll allow [the] defense to submit a written pleading on it.").[5]

The military judge emphasized that Mr. Bergdahl was innocent unless and until the prosecution proved otherwise.  *See id.* at 1559:6–18 ("as [he] sits here today, he is an innocent man.  The government has done absolutely nothing to this point in these proceedings to establish any fact that would prove any element of either offense.  They have the burden to do that; Sergeant Bergdahl has no burden to prove his innocence.").  He denied the prosecution's motion to admit evidence regarding injuries prior to sentencing, holding:  "The accused is not to be convicted because, while searching for him, his comrades were horrifically injured."  Ruling and Order, Dec. 16, 2016, Ex. 4 hereto, ¶ 9.  And when the defense complained about the prosecution referring to Mr. Bergdahl as a "deserter," he "admonish[ed]" the prosecution "from using [that term] in situations where it's irrelevant."  Tr. at 682:17–687:4.

### 1.  First and Second UCI Motions

Three times during the course of the court-martial proceedings, the defense brought motions based on alleged unlawful command influence.  The defense focused its first motion on statements by Senator John McCain.  The parties submitted thorough briefing, and the judge held extensive argument on the issue.  At argument, the military judge encouraged defense counsel to

---

[4] *See also, e.g.,* Tr. at 569:7–9 (in response to defense counsel's concerns:  "as an officer of the court, if you represent to me that you are unable to accomplish it in a time line that's already set, then I'm going to give you more time."); *id.* at 1031:15–1032:4 (in response to defense concerns about timing stating:  "Like I've said from the beginning, I'm not going to let the government take a year and a half to get discovery to you and then give you two months to absorb it and adjust to it. So we will figure that out when we get there."); *id.* at 1065:17–19 ("Don't worry about asking me for time.  I'm going to give you all the time you need . . . ").

[5] *See also, e.g.*, Tr. at 642:17–643:6; *id.* 428:6–16; *id.* at 430:1–2; *id.* at 1226:7–17, 1227:16–1228:5; *id.* at 1334:4–6; *id.* at 1431:16–17.

take the time he needed, *id.* at 488, and counsel paused thrice to thank the judge for permitting him so much time, noting that he had been "very generous." *Id.* at 484:11, 488:1–2, 513:4.

On September 28, 2016, the military judge denied the defense's motion, holding that Senator McCain was not a person who could commit unlawful command influence and that an objective observer "would recognize Senator McCain's ill-advised statements for just what they were – political posturing." Findings of Fact, Conclusions of Law and Ruling – Defense Motion to Dismiss (Sept. 28, 2016), Ex. 5 hereto, ¶¶ 8–12. Seeking relief from that decision, Mr. Bergdahl petitioned the ACCA and then the CAAF for a writ of mandamus; however, both of those appellate courts denied his petitions. *See* Order, *Bergdahl v. Nance*, ARMY MISC 20160650 (Nov. 10, 2016), Ex. 6 hereto; Order, *In re Robert B. Bergdahl*, USCA DKT. No. 17-0069/AR (Dec. 7, 2016), Ex. 7 hereto.

The defense subsequently moved to dismiss the charges against Mr. Bergdahl based on statements about Mr. Bergdahl that President Trump made while he was a candidate. Again, the parties submitted extensive briefing and argument on the issue, and the defense team prepared a compilation video of President Trump's remarks. When they sought to play the full video in open court, the judge said he did not "want to further perpetuate this disturbing material." Tr. at 1071:17–20. The prosecution argued the statements at issue were made by President Trump as a candidate, and therefore could not constitute unlawful command influence. *Id.* at 1091:4–1092:3, 1092:11–14. During that argument the military judge asked: "[Y]ou're not at all disturbed by the statement . . . [where] he said . . . 'If I get in, we will review this case,' after ranting and raving about no jail time"? *Id.* at 1098:18–1099:2. He also questioned whether the President had been getting his facts through "fake news or some other thing he[] [was] misinterpreting." Tr. at 1099:5–8.

The military judge issued his decision on this motion on February 24, 2017. Findings of Fact, Conclusions of Law and Ruling – Defense Motion to Dismiss for Unlawful Command Influence, Feb. 24, 2017, Ex. 8 hereto ("Feb. 24, 2017 UCI Decision"), ¶ 8. Although he described the statements by candidate Trump as "troubling," "disturbing and disappointing," *id.*

¶ 11, he found they did not amount to unlawful command influence because the President was a private citizen when he made those statements. *Id.* However, he indicated he would "take special care to ensure that the comments by Mr. Trump do not invade this trial." *Id.* ¶ 13. He held that "in order to vigilantly ensure a fair trial," the Court would require the parties "to submit a members' questionnaire on these issues which [would] be provided to the members well in advance of trial and returned for review by the parties well prior to the *voir dire*." *Id.* ¶ 15. He further noted he would "allow very liberal *voir dire* on this topic." *Id.*

Consistent with that ruling, the defense subsequently submitted a set of questions for potential panel members. *See* Tr. at 1284:7–1286:18. The prosecution objected to the inclusion of a number of those questions, but the military judge told the defense: "[O]bviously, from my ruling on your previous motion, I'm inclined in your favor on most of this stuff. So you're going to get to ask most of these questions in the written form and then follow up later in oral voir dire here in court." *Id.* at 1296:1–4. Later, having reviewed changes made by the military judge to their questions, defense counsel said: "I express my appreciation for your craftsmanship in many of the changes that are made. I think some things are made clearer and in a way that I think it's going to help us get to the truth." *Id.* at 1376:20–1377:2.[6]

### 2. Guilty Plea, Providence Inquiry, and Acquittal as to Desertion after June 30, 2009

On October 16, 2017, Mr. Bergdahl pled guilty to desertion and misbehavior before the enemy. As to the former, his plea included modifications to the description of the charged offense. *See* Dep't of Defense Report of Result of Trial, Ex. 10 hereto, at 2; *see also* Tr. at 1631:12–29. Most significantly, whereas the offense as charged stated that he "remained absent in desertion until on or about 31 May 2014"—a period of more than five years—Mr. Bergdahl pled guilty only to being absent in desertion to a single day. Result of Trial at 2. As to the

---

[6] Ultimately, Mr. Bergdahl elected to be tried by the military judge rather than by a panel. *See* Request for Trial before Military Judge Alone, Sept. 27, 2017, Ex. 9 hereto.

charge that he was absent in desertion through May 31, 2014, Mr. Bergdahl pled not guilty.  *See id.* at 3; Tr. at 1631:24.

After receiving Mr. Bergdahl's guilty plea, the military judge commenced the providence inquiry,[7] explaining to Mr. Bergdahl that "[his] plea of guilty [would] not be accepted unless [he] understand[s] its meaning and effect."  *Id.* at 1632:7–8.  The military judge advised—and Mr. Bergdahl acknowledged, *see id.* at 1632:14–15—that Mr. Bergdahl could consult with his attorneys at any time during the colloquy, prior to answering the judge's questions, and if Mr. Bergdahl had any questions or was confused by something the judge said, he should "feel free to stop the proceedings" to talk with his counsel.  *Id.* at 1632:9–14.

The military judge explained:  "If you do not believe that you're guilty, then you should not for any reason plead guilty," *id.* at 1633:3–4, and instructed: "Your plea of guilty . . . will not be accepted unless . . . you're pleading guilty because you actually are, in fact, guilty."  *Id.* at 1632:19–1633:2.  At the outset of the questioning, the military judge instructed Mr. Bergdahl, for each element, "ask yourself two things:  [n]umber one, is the element true and, number two, whether you wish to admit that it's true."  *Id.* at 1635:4–5.

He asked Mr. Bergdahl to describe in his own words why he believed himself to be guilty of the charged offenses, *id.* at 1641:8–10, and Mr. Bergdahl did so.  *Id.* at 1641:20–1642:18.  As to desertion, Mr. Bergdahl indicated that the offense accurately and correctly described his actions.[8]  *Id.* at 1661:2–5.  The military judge then turned to the charge of misbehavior before the enemy.  At the conclusion of extensive questioning about that charge, Mr. Bergdahl explained in his own words why his actions had endangered the safety of Observation Post Mest

---

[7] Under Article 45 of the UCMJ, "[b]efore accepting a guilty plea, 'a military judge must conduct a thorough inquiry to insure the accused understands the meaning and effect of the plea, that he enters it voluntarily, and that he is in fact guilty of the offense.'"  *Scott v. United States*, 351 F. Supp. 3d 1, 3 (D.D.C. 2018) (quoting *United States v. Roane*, 43 M.J. 93, 98 (C.A.A.F. 1995)).  *See infra* 29 (discussing the significance of the providence inquiry in these proceedings.)

[8] During his providence inquiry, Mr. Bergdahl denied that he intended to cause search and recovery operations, although he acknowledged that his actions had caused such operations and endangered the people involved.  *See* Tr. at 1663:4–1664:9; *id.* at 1666:9–16.

and Task Force Yukon.  *Id.* at 1665:14–21, 1666:1–5.  After further discussion of the facts, Mr. Bergdahl affirmed that the offense accurately and correctly described what he had done.  *Id.* at 1666:14–16.  Prior to accepting Mr. Bergdahl's plea, the military judge again questioned him regarding whether his plea was voluntary and fully informed by the advice of his counsel.  *Id.* at 1674:5–6.  He further asked whether Mr. Bergdahl understood that, even if he believed himself to be guilty, he had "the legal and moral right to plead not guilty and to force the government to prove [his] guilt by legal and competent evidence beyond a reasonable doubt."  *Id.* at 1675:14–16.  Having received satisfactory answers to these and several other questions, the military judge found Mr. Bergdahl's plea to be provident and accepted it, *id.* at 1676:6, but advised that the plea could be withdrawn for good reason, before Mr. Bergdahl's sentence was announced, *id.* at 1676:17–19.

The parties then argued about the date until which Mr. Bergdahl had remained absent in desertion.  Although he was charged with desertion until his return to United States custody in May 2014, Mr. Bergdahl pled guilty to being in desertion for only a single day.  *See supra*. While the defense maintained that he should not be found guilty for the period during which he was held captive by the Taliban, and therefore unable to return, the prosecution argued that he should be held responsible for the full period, since it was his misconduct that led to his capture. *See id.* at 1679:9–1699:3.  The military judge observed that Mr. Bergdahl was unable to return due to the criminal acts of others, and asked the prosecution:

> I assume that Afghanistan has a law against insurgents or anybody else capturing or kidnapping innocent third-parties and holding them hostage . . . . Do we punish people in our legal system for the criminal acts of others that they do not conspire with, aid and abet, or any of those inchoate theories of criminal liability?

*Id.* at 1683:11–13; 1683:19–1684:2.  The prosecution argued that his capture by the Taliban was the foreseeable consequence of his desertion, but the military judge disagreed:  "if you engage in desertion, the foreseeable consequences of desertion are punishment for desertion, not being

captured by the enemy and held for . . . 4 years and 10 months."[9]  Tr. at 1687:6–9.  Ultimately, the military judge found Mr. Bergdahl guilty only of the charges to which he had pled guilty, holding that his desertion began and ended on June 30, 2009.  *See id.* at 1706:8–22.

### 3.  Third UCI Motion

Shortly thereafter, the defense submitted a third motion alleging unlawful command influence, based on the President's October 16, 2017 remarks that, while he could not comment on Mr. Bergdahl's case, he "[thought] people [had] heard [his] comments in the past."  *Id.* at 1728:7-11; 1727:4–8.  The parties again submitted both briefing and oral argument on this issue. Before commencing the argument, the military judge reminded Mr. Bergdahl that he had the right to withdraw his guilty plea if there was a good reason for doing so, and Mr. Bergdahl declined to do so.  *Id.* at 1720:17–1721:10.  The military judge then gave both parties an opportunity to subject him to *voir dire* on the issue of unlawful command influence.  Asked whether he had been aware of the President's comments, the military judge responded that he had "purposely avoided . . . any coverage of this case" and "had no idea that the president said anything" until the defense submitted its motion.  *Id.* at 1723:12–19.  The prosecution then asked whether any of the information he learned from the defense filing made him believe that he would be unable to preside over Mr. Bergdahl's court-martial "impartially and fairly."  *Id.* at 1723:20–1724:2.  The military judge responded:

> No. I'm what's referred to as a terminal Colonel, which means I'm not going anywhere but the retirement pastures.  And that's in almost a year from now.
>
> I have never aspired to any rank. I did aspire to be a military judge 13 years ago; but since accepting that posting or assignment, I have recognized that that, in the modern JAG Corps, pretty much, meant that I was going to stay at the rank I was, which at the time was Lieutenant Colonel.  So I was actually a little bit surprised to be promoted to Colonel. And when that happened, I knew obviously that any general officer rank was beyond my reach and, quite frankly, nothing I ever aspired to.
>
> So that's a long way of saying, "No, no effect on me whatsoever."  I don't expect to go anywhere but back home as soon as the Army is done with me in a year.

---

[9]  During the course of the argument presented by counsel for the prosecution on this issue, the military judge interrupted him, saying:  "we cannot use the facts from his providence inquiry as evidence to prove the stuff [Mr. Bergdahl has] pled not guilty to," Tr. at 1685:6–8, "[s]o I won't consider it for that purpose."  *Id.* at 1685:10.

*Id.* at 1724:3–16.  Presenting the defense's argument on this motion, defense counsel observed: "the White House . . . was long aware of the dim view the Court took of President Trump's pre-inauguration statements about Sergeant Bergdahl."  *Id.* at 1732:15–19.

When the prosecution presented its argument, the military judge questioned counsel extensively regarding the government's interpretation of the President's meaning.  *See id.* at 1736:1–1740:3.  The military judge noted that "in spite of the . . . initial acknowledgement that he shouldn't say anything, [the President] goes on to say something and talk about the sentencing in this case which he obviously knew was pending and then referring back to the things that he's said before."  *Id.* at 1739:19–1740:3; *see also id.* at 1752:16–19.  With regard to the President's statements, the military judge further commented:  "I'm not influenced by these matters in the least and certainly not in a negative way towards Sergeant Bergdahl."  *Id.* at 1757:6–7.

Ruling on the defense's motion, the military judge held that the defense had shown some evidence that unlawful command influence existed, but that an objective, disinterested observer would not harbor significant doubt about the fairness of the proceedings.  Findings of Fact, Conclusions of Law and Ruling – Defense Renewed Motion to Dismiss for Unlawful Command Influence, Oct. 30, 2017, Ex. 11 hereto, ¶ 6(a), (c).  In support, he cited that his mandatory retirement date was approaching; that he had no hope of promotion; and that he was "completely unaffected by any opinions President Trump may have about SGT Bergdahl."  *Id.* ¶ 2(i); *id.* (noting that he did not follow the news and only learned of the President's comments through the defense's motions).  He further noted that the convening authority and staff judge advocate swore by affidavit that their decisions were at their own discretion and not impacted by any outside influence.  *Id.* ¶ 2(j).  The military judge therefore found that neither he nor the convening authority nor the staff judge advocate held any "fear of any repercussions from anyone if they do not agree with [the] sentence in this case."  *Id.* ¶ 6(c).  Additionally, the military judge cited a statement released by the President through his press secretary that "[made] clear that he does not expect any certain sentence in this case" and that he expected

officials involved in the case to "use [their] own discretion and judgment and do what [they] think is right under the law." *Id.*

Notwithstanding these findings, the military judge indicated that he would "consider the President's comments as mitigation evidence" in determining an appropriate sentence in the case. *Id.* ¶ 6(d).[10] Furthermore, he noted he would require anyone involved in post-trial aspects in the case to read the above-described statement from the White House Press Office, unless the defense requested that the court not issue such an order. *Id.*

### 4. Sentencing

#### a. Aggravation Evidence

During sentencing proceedings, the prosecution presented testimony from multiple witnesses who described the search and recovery operations undertaken to try to save Mr. Bergdahl, and the injuries sustained during the course of those efforts.

#### i. Recovery Operations, Generally

As to the recovery operations, Captain John Billings, the leader of Mr. Bergdahl's platoon at the time he went missing, testified: "Everybody in Afghanistan was looking for Bergdahl." Tr. at 1807:13; *see also* 1826:1–4. He described grueling conditions during search operations, *see id.* at 1806:14–1807:2, and explained that the increased tempo and shortened planning time for those operations resulted in increased risk. *See id.* at 1809:12–15. They nonetheless undertook those missions because: "We leave no man behind, . . . and bring them home if possible, whatever it may take." *Id.* at 1811: 15–18. Likewise, Evan Beutow testified that he had endured "miserable" conditions as part of the rescue effort because: "My guy was gone." *Id.* at 1854:10; 1852:20–1853:12. Mr. Beutow testified that he had gotten so sick during the recovery effort that a teammate thought he was dying. *See id.* at 1853:15–16.

Mr. Bergdahl's battalion commander in Afghanistan, COL Clinton Baker testified that because the intelligence indicated that the Taliban were going to try to move Mr. Bergdahl to

---

[10] During sentencing proceedings, the military judge noted again that he would consider a video recording of the President's comments "for the purposes of mitigation." Tr. at 2585:16–17.

Pakistan, the recovery effort was "urgent" and "time was critical." *Id.* at 1903:6–9; 1897:4–6. He testified:  "[the operational tempo] went off the charts.  It was everybody, a hundred percent, all of the time, 24/7.  The only time you slept was just when you couldn't -- you couldn't stay conscious anymore." *Id.* at 1900:15–20.  He noted engagement with the enemy "went up significantly." *Id.* at 1902:1–2.  Previously, they had faced "maybe an ambush every week or so," but after the DUSTWUN, "there was not a day that went by that there weren't multiple direct-fire engagements and multiple IEDs." *Id.* at 1901:18–1902:4.[11]

COL (Retired) Robert Campbell testified that "[w]hen you're in a DUSTWUN situation . . . your objective is to get as many people out into the battlespace as possible, because time is not on your side. The less forces you have out gathering information and doing missions, the more chance the enemy has to move a captured soldier around." *Id.* at 1956:13–17.  He testified that, because the objective was the return of an American soldier, "of course" he was willing to accept greater risk during DUSTWUN operations. *Id.* at 1957:11–19.

### ii.  Servicemembers Injured in Recovery Operations

1)  Senior Chief Petty Officer (Retired) James Hatch who had been part of the Naval Special Warfare Unit, *i.e.* a Navy SEAL, was wounded in the effort to rescue Mr. Bergdahl. *See id.* at 1777:20–1778:3, 1780:3–18.  Although another mission that had been planned for that evening had been postponed due to environmental conditions, Senior Chief Hatch testified that hostage rescue missions were treated differently:  "you put the force at a much greater risk." *Id.* at 1781:1–4, 8.  He described a chaotic situation in which his team was "mov[ing] as quickly as [they] could . . . looking for [Mr. Bergdahl]," assisted by Remco, a military dog. *Id.* at 1783:11–

---

[11] COL (Retired) John White, commander of an aviation battalion in Afghanistan at the time of Mr. Bergdahl's disappearance, likewise testified that his battalion was subject to elevated risk conducting DUSTWUN operations. *See* Tr. at 1915:5–6; 1916:1–14; 1916:18–1917:2; 1932:19–1933:1.  He explained that it was "high risk" going into an area as to which they did not have an opportunity to "do a good intelligence preparation" with respect to the enemy threat, *id.* at 1931:18–20, and that there was additional risk associated with landing in and flying through areas without an adequate opportunity for preparation. *See id.* at 1932:1–5; *see also id.* at 1941:4–1942:11. Although none of the people under his command were injured during the DUSTWUN operations, *see id.* at 1940:3–6, aircraft under his command were shot and damaged and someone on board, not under his command, was wounded. *See id.* at 1942:17–1943:8.

12, 16–17, 1784:6–12.  As the team neared unknown figures, those figures opened fire with AK-47s, shooting Remco in the head and Senior Chief Hatch in the leg.  *See id.* at 1787:15–20.  A couple of servicemembers who had received medical training came across an open field—drawing fire themselves—to provide help.  *See id.* at 1788:13–19.  On the MEDEVAC helicopter, Remco's handler continued to try to resuscitate him, but to no avail.  *Id.* at 1789:4–9.  As for Senior Chief Hatch's own injury, he testified that he had been shot in the right distal femur, and required eighteen surgeries as a result.  *Id.* at 1789:10–16.

2)  Specialist Jonathan Morita testified that he was injured during efforts to recover Mr. Bergdahl.  *Id.* at 2036:15–20.  After his group started to receive heavy fire, he was struck by an RPG in his right hand.  *See id.* at 2038:15–2039:18.  While he was tending to his and another team member's wounds, another RPG landed where he was, lodging shrapnel in his elbow.  *See id.* at 2040:1–3.  After being MEDEVACed out, he underwent several months of treatment.  *See id.* at 2042:16– 2047:21.  He had to relearn how to write, how to eat—all of the functions that require basic fine motor skills.  *See id.* at 2048:1–2049:4.  At the time of his testimony, Specialist Morita continued to suffer pain from his injuries and still had not regained full use of his hand.  *See id.* at 2049:5–12, 2051:14–2052:3.

3)  Master Sergeant Allen suffered the gravest injuries in the effort to recover Mr. Bergdahl.  Because Master Sergeant Allen was unable to testify for himself, the prosecution presented testimony from other servicemembers, his wife, and his doctor.  Lieutenant Colonel John Marx, who participated in the operation on which Master Sergeant Allen was wounded, testified that, after their team was attacked, the need arose to call for support.  *See id.* at 1969:11–1970:17, 1981:2–12, 20.  Master Sergeant Allen jumped out from behind a protected position—as was necessary to make the call—and, within a minute or two, was shot just below the temples.  *Id.* at 1982:11–13; 1986:6–12.  At that point, there were RPGs, mortars, PK machine guns, and AK-47s being fired at the team.  *See id.* at 1983:8–11.  Sergeant Walters ran through an exploding RPG to administer first aid to Master Sergeant Allen.  *Id.* at 1983:15–19.  They also called for the medic, but found that the medic himself had been hit.  *Id.* at 1984:1–4.  When the

- 17 -

MEDEVAC arrived, the team gathered the wounded; Lieutenant Colonel Marx said that picking up Master Sergeant Allen and taking him to the chopper was "probably one of the hardest things [he'd] done in [his] life." *Id.* at 1985:5–6.

Dr. Rafael Mascarinas, Master Sergeant Allen's physician, testified that as a result of his injuries, Master Sergeant Allen was in a "minimally conscious state," *id.* at 2114:8–21, suffered paralysis, and was not able to speak or have any meaningful or functional movements. *Id.* at 2115:19–21. Dr. Mascarinas added that Master Sergeant Allen could still feel pain, and that he was "always" in a state of chronic pain. *Id.* at 2116:16–2117:2. He indicated that the prognosis was "really poor," and that Master Sergeant Allen would have a life expectancy of 8–10 years due to medical complications. *Id.* at 2117:5–7.[12]

Mrs. Sharon Allen, Master Sergeant Allen's wife, testified about the effect of his injuries on his day-to-day life. She described that he could not speak or perform basic tasks for himself. *See id.* at 2137:1–2138:10, 2147:14–20; 2143:11–2145:16. Whereas he had previously been a very active father, *see id.* at 2129:16–21, 2130:7–16, he never had a chance to play with or talk to one of his children because the child was so young when he was injured. *See id.* at 2130:17–2131:10. The injury also took away his ability to interact with his wife; she testified: "we can't even hold hands anymore without me prying open his hand and putting my hand in there." *Id.* at 2135:11–13, 18–19.

### b. Mitigation Evidence

The defense began its presentation with a statement[13] from Mr. Bergdahl in which he stated that "it was never [his] intention for anyone to be hurt, and [he] never imagined that would happen." *Id.* at 2154:13–14. He acknowledged "[s]aying the words 'I'm sorry,' is not enough . . . [o]ffering condolences isn't enough," and added, as to the people that had suffered as a result

---

[12]  Master Sergeant Allen died in October 2019. *Bergdahl*, 80 M.J. at 241 n.13.

[13]  The military judge, in admitting into evidence the transcript and recording of Mr. Bergdahl's interview with Major General Dahl, *see supra* 6–7, stated, unasked by the defense, that in reviewing that material he "[would] certainly look for any aspects of it that coincide with [Mr. Bergdahl's] unsworn [statement]." Tr. at 2162:2–3.

of his actions:  "I can only hope that my accepting responsibility for my mistake and them hearing that I understand what I did was very wrong can help."  *Id.* at 2155:1, 6, 9–11.

The defense presented several categories of significant evidence in mitigation.  The defense focused on the brutal conditions Mr. Bergdahl endured at the hands of the Taliban and the lasting effects of those conditions, as well as his escape attempts, on his physical and mental health.  *See*, *e.g.*, *id.* at 2162:5–2191:11, 2193:2–2211:6, 2214:5–2230:10; 2273:1–2274:15; 2275:1–2281:2; 2320:15–19; 2321:14–20; 2339:6–2354:12; 2359:5–2360:9; 2374:14–2385:20; 2462:15–16.  The defense also presented testimony that Mr. Bergdahl suffered from severe preexisting psychiatric conditions, including schizotypal personality disorder,[14] prior to his captivity that had contributed to his decision to leave his post.  See, *e.g.*, *id.* at 2451:13–2474:1, 2506:1–2507:5; 2245:5–2247:18 (squad leader testifying about having expressed concerns about Mr. Bergdahl's adjustment to deployment).  Additionally, the defense presented testimony regarding, *inter alia*, his good conduct in the military prior to the date of his offenses and after his return, *see*, *e.g.*, *id.* at 2242:12–2244:18, 2397:7–2402:4; the valuable intelligence that he provided to the Army upon his return to military custody, *see*, *e.g.*, *id.* at 2212:1–2214:4; 2265:10–2266:9; 2271:1–19; 2281:3–2283:11; 2290:12–2291:21; 2295:12–2303:9; 2323:15–2326:7; a job that the founder of an animal rescue organization offered to Mr. Bergdahl working with feral cats, *see id.* at 2431:19–2433:16; and testimony regarding the negative affect that further confinement would have on Mr. Bergdahl's health, *see*, *e.g.*, *id.* at 2519:15–2520:20.

c.  **Argument and Sentence**

At the end of sentencing proceedings, the prosecution argued that 14 years confinement would be just in light of the evidence in aggravation and mitigation.  *See id.* at 2668:3–2670:8. The defense argued against confinement, but acknowledged that "punishment is warranted for his action," and therefore "request[ed] that [the court] give Sergeant Bergdahl a dishonorable

---

[14]  The prosecution, in response, presented expert testimony from Dr. Gregory Saathoff regarding schizotypal personality disorder.  Dr. Saathoff estimated that about 4.6% of the population likely has this disorder, which would translate to about 87,000 servicemembers.  Tr. at 2606:4 – 2607:21.  He further testified that it was not a diagnosis that was of particular concern.  *Id.* at 2610:8–17.

discharge."[15]  *See id.* at 2694:7–9.  The military judge then discussed with Mr. Bergdahl the ramifications of a dishonorable discharge including as to stigma and the availability of benefits, and Mr. Bergdahl indicated that he understood but nonetheless requested a dishonorable discharge if it would preclude a sentenced of confinement.  *See id.* at 2695:1–2697:1.

Following deliberations, the military judge sentenced Mr. Bergdahl to be dishonorably discharged from the service, to be reduced to the grade of E-1, and to forfeit $1,000 pay per month for 10 months.  *See id.* at 2704:1–5.  The military judge informed Mr. Bergdahl of his right to present matters to the Convening Authority in support of a request for clemency.  *Id.* at 2651:6–9; *see also id.* 2651:9–2652:11.  Mr. Bergdahl, however, did not make such a submission.

### C.  Post-Conviction Review by Military Appellate Courts

Mr. Bergdahl appealed his conviction and sentence to the ACCA, including on the basis of unlawful command influence.  Following extensive briefing and argument, the ACCA issued its decision on July 16, 2019.  That court carefully examined each of Mr. Bergdahl's three motions, and although the court did not agree with some of the military judge's analysis, the court affirmed his conclusion that there was no actual or apparent unlawful command influence in Plaintiff's case.  *See United State v. Bergdahl*, 79 M.J. 512 (Army Ct. Crim. App. 2019) (observing that the military judge's factual findings "on each of the defense motions to dismiss based on UCI were well documented and supported by the evidence").

Mr. Bergdahl then appealed to the CAAF.  After briefing and argument, the CAAF concluded that the defense had shown some evidence of unlawful command influence, but that a finding of apparent unlawful command influence was not warranted "because there was no intolerable strain on the military justice system."  *Bergdahl,* 80 M.J. at 239; *see infra* (discussing the court's analysis).  Following this decision, Mr. Bergdahl sought reconsideration—whereupon

---

[15]  By operation of law, a punitive discharge automatically results in a reduction to E-1.  *See* 10 U.S.C. § 858a; Army Reg. 27-10, ¶ 5-38).  Thus, Mr. Bergdahl's specific request for a dishonorable discharge, if adjudged, would result in such a reduction.

a third round of briefing at the appellate level followed—and the CAAF denied reconsideration on October 14, 2020.  *See U.S. v. Bergdahl*, 80 M.J. 362 (C.A.A.F. 2020).  Plaintiff also petitioned the ACCA for a writ of error coram nobis.  That issue was fully briefed, and Sections III.A and B detail the issue raised in his petition, and that court's consideration and disposition of his request.  *See infra* 34–37.  After the ACCA denied his petition, Plaintiff sought reconsideration before the CAAF.  On consideration of that petition, the CAAF summarily denied the Plaintiff's request.  *Bergdahl v. United States*, 81 M.J. 128 (C.A.A.F. Feb. 2, 2021).

## ARGUMENT

### I.      Legal Standards

#### A.  Standard on a Motion to Dismiss for Failure to State a Claim

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint."  *Burkes v. Holder*, 953 F. Supp. 2d 167, 171 (D.D.C. 2013) (citation omitted).  To withstand a motion to dismiss for failure to state a claim, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and alterations omitted).  Mere "labels and conclusions," and "naked assertions devoid of further factual enhancement," *id.*, are not sufficient.  The Court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must the Court presume the veracity of legal conclusions that are couched as factual allegations, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On such a motion, the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  The Court may "take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment."  *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004) ("*New I*").  "Among other things, a court may take judicial notice of the factual findings of another court as part of the public record."  *Id.* at 89 (citing *Weil v. Markowitz*, 829 F.2d 166, 173 (D.C. Cir. 1987)).  "Thus,

in considering [Defendant's] motion to dismiss for failure to state a claim, the Court may

consider the record created by the military courts as well as the factual findings of the court-

martial." *Id.*

### B.  Limitations on Collateral Review of Court-Martial Convictions

"Federal district courts have limited and deferential jurisdiction over decisions of military

tribunals." *Scott v. United States*, 351 F. Supp. 3d 1, 7 (D.D.C. 2018).  For non-custodial cases,

"[c]ollateral relief from the consequences of a court-martial judgment is barred unless it appears

that the judgment is void." *Priest v. Sec'y of Navy*, 570 F.2d 1013, 1016 (D.C. Cir. 1977) (citing

*Councilman*, 420 U.S. at 748).  That is, the error in the military court's judgment "must be

fundamental." *Sanford v. United States*, 586 F.3d 28, 32 (D.C. Cir. 2009) (noting the deference

due the judgments of the military justice system established by Congress) (citing *Councilman*,

420 U.S. at 753).

Although, under Supreme Court precedent and the law of the Circuit, the above-described

"void" standard applies to collateral attacks by persons not in custody, the D.C. Circuit and

district courts considering noncustodial challenges have often applied a different standard—the

"full and fair consideration" test articulated by the plurality in *Burns v. Wilson* for collateral

attacks via habeas by persons who *are* in custody.  *See*, *e.g.*, *Sanford*, 586 F.3d at 31; *United

States ex rel. New v. Rumsfeld* ("*New II*"), 448 F.3d 403, 408 (D.C. Cir. 2006); *Scott*, 351 F. Supp.

3d at 7–8.  Such courts have reasoned that "'non-habeas review is if anything more deferential

than habeas review of military judgments,'" and "[t]hus, a military court's judgment cannot be

considered void 'if it satisfies *Burns*' 'fair consideration' test.'" *Scott*, 351 F. Supp. 3d at 7–8

(quoting *New II*, 448 F.3d at 408).

The *Burns* test involves two steps:  "(1) a review of the military court's thoroughness in

examining the relevant claims, at least where thoroughness is contested; and (2) a close look at

the merits of the claim, albeit with some degree of deference." *Sanford*, 586 F.3d at 32.  The

*Burns* plurality explained:  "when a military decision has dealt fully and fairly with an allegation

raised in an application [for collateral relief], it is not open to a federal civil court . . . simply to re-evaluate the evidence." *Burns*, 346 U.S. at 142.[16]

For all the reasons discussed below—whether Plaintiff's claims are reviewed through the properly-applicable "void" standard or the less deferential "full and fair consideration" test—his claims are barred.  The military courts fully and fairly considered his claims, and there is no fundamental flaw in their analysis that could support disturbing those decisions.

## II.     The Court Should Dismiss Plaintiff's Claim of Unlawful Command Influence.

The deference that "should be accorded the judgments of the carefully designed military justice system established by Congress," *Sanford*, 586 F.3d at 32, is heightened "'[w]hen dealing with areas of law peculiar to the military branches'" such as unlawful command influence.  *New I*, 350 F. Supp. 2d at 92 (quoting *Middendorf v. Henry*, 425 U.S. 25, 44 (1976)); *see also Walters v. Sec'y of Def.*, 725 F.2d 107, 109 n.3 (D.C. Cir. 1983) ("We note that regarding military law, the decisions of the [highest military appellate court] are almost always to be accorded 'great deference' by Article III courts") (quoting *Middendorf*, 425 U.S. at 43).  Taken with the precedent discussed above, this guidance indicates that the Court should examine, with great deference, the decision of the CAAF to determine whether there was an error so fundamental in that decision that the judgment is void.  *See supra* 22.

The Amended Complaint suggests an altogether different standard in discussing the breakdown of votes within the military appellate courts and describing the dissenting decisions on the issue of unlawful command influence, *see* Am. Compl. ¶¶ 23–26, implying that if reasonable minds could reach a different decision from that reached by the CAAF, then the relief Plaintiff seeks is warranted.  Such an approach would be contrary to the precedent; as explained above, a federal court's review of the military courts' decisions is limited and deferential.  And, although the evidence overwhelmingly supports the CAAF's decision, even if the Court were to find that

---

[16] *See also New II*, 448 F.3d at 407 ("In military habeas corpus cases, *even more than in state habeas corpus cases*, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted.  Congress has provided that these determinations are 'final' and 'binding' upon all courts.") (quoting *Burns*, 346 U.S. at 142) (emphasis the D.C. Circuit's).

reasonable minds could differ as to the CAAF's analysis, such a conclusion could not support the relief Plaintiff seeks. Rather, the CAAF's opinion may not be disturbed unless it suffers a flaw so fundamental that it renders the decision "void." *See supra* 22. Because any opinion that fully and fairly considers a plaintiff's claim cannot be found to have such a defect, *see id.*, the CAAF's full and fair consideration of Plaintiff's unlawful command influence claim is discussed below.

### A.  The Military Courts Exhaustively Considered Plaintiff's Claims of Unlawful Command Influence.

As to the first prong of the *Burns* test:  it would be an understatement to say that the military courts "fully" considered Plaintiff's claims of unlawful command influence.  Plaintiff thrice raised the issue during his court-martial proceedings, submitting extensive argument and briefing, and giving rise to three thoughtful opinions from the military judge. *See supra* 8–10, 13–15. Also during the pendency of his court-martial, Plaintiff petitioned the ACCA, and then the CAAF, for a writ of mandamus after the military judge denied his first motion alleging unlawful command influence. *See supra* 9 (noting that the ACCA and CAAF considered and summarily denied those petitions).  Following Plaintiff's conviction and sentence, he thrice raised the issue of unlawful command influence on appeal, first before the ACCA, and then twice before the CAAF, seeking reconsideration after that court affirmed his sentence and conviction on direct appeal. *See supra* 20–21 (noting that the ACCA and CAAF each published opinions addressing Plaintiff's claims, and that the CAAF considered and summarily denied the Plaintiff's request for reconsideration).  Altogether, the military courts, after considering extensive argument and hundreds of pages of briefing and exhibits on various facets of Plaintiff's claims of unlawful command influence, have written five thorough and well-reasoned decisions addressing his claims.   This amply satisfies the first prong of the *Burns* standard.

### B.  The Military Courts Correctly Concluded that an Objective, Disinterested Observer Fully Informed of All the Facts and Circumstances Would Not Harbor a Significant Doubt about the Fairness of These Proceedings.

Plaintiff contends that the CAAF "mistakenly found that the government had carried its [unlawful command influence] burden beyond a reasonable doubt and that an intolerable strain

- 24 -

had not been placed on public confidence in the administration of justice." Am. Compl. ¶ 78. Specifically, Plaintiff identifies two alleged errors in the CAAF's analysis. First, Plaintiff argues that the CAAF "imputed to the objective, disinterested observer information that a member of the general public would not know." *Id.* ¶ 55(a). Second, Plaintiff contends that the CAAF "determined in the absence of evidence that no convening authority would have granted post-trial clemency notwithstanding strong mitigating evidence." *Id.* ¶ 55(b). As to both issues, for the reasons explained below, Plaintiff is mistaken. A close review of the CAAF's analysis reveals no basis on which to disturb its thorough and well-reasoned opinion, much less a "fundamental" flaw that could render its decision "void." *See supra* 22–23.

### 1. In Alleging that the CAAF Imputed to the Objective, Disinterested Observer Information that a Member of the General Public Would Not Know, Plaintiff Urges a Standard Contrary to the Express Language of the Applicable Test.

The CAAF in this case framed its analysis with the well-established test for apparent unlawful command influence. *See Bergdahl*, 80 M.J. at 234. That test, which is the product of "precedents, principles, and procedures . . . which have been articulated by [the CAAF] over the course of more than six decades," *United States v. Boyce*, 76 M.J. 242, 250 (C.A.A.F. 2017), provides that if the accused presents "some evidence" that unlawful command influence occurred, the burden shifts to the prosecution to establish that either "the 'predicate facts proffered by the [accused] do not exist'" or "the facts as presented do not constitute unlawful command influence." *Bergdahl*, 80 M.J. at 234 (quoting *Boyce*, 76 M.J. at 249). "If the government cannot succeed at this step, it must prove beyond a reasonable doubt that the unlawful command influence did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all of the facts and circumstances, would *not* harbor a significant doubt about the fairness of the proceeding." *Id.* (emphasis in original) (alteration and quotations omitted); *see also Turner v. Spencer*, 335 F. Supp. 3d 72, 80 (D.D.C. 2018).

Plaintiff objects that the CAAF, in applying this test, "imputed to the objective, disinterested observer information that a member of the general public would not know."  Am. Compl. ¶ 55(a).  The test, however, provides that the observer contemplated therein must be "*fully* informed of *all* the facts and circumstances."  *Boyce*, 76 M.J. at 249 (emphasis added). The limitation that Plaintiff suggests would be contrary to this requirement, and Defendant is aware of no case in which a court has confined the "objective, disinterested observer" of this test to only that which is actually known to the general public as Plaintiff proposes.  *Id.*

Indeed, such a rule would be unworkable.  There would be no principled way to discern what facts about a particular case were *actually* known to the general public, and, in most cases, much of the material information would be unknown.  For example, in *Boyce*, the CAAF determined that apparent unlawful command influence had occurred, based on facts that included comments made during a telephone call from the Chief of Staff of the Air Force to the convening authority in that case, as well as the content of that convening authority's retirement request.  *See Boyce*, 76 M.J. at 251–53.  That such information plainly would not have been known to most members of the public did not enter into the CAAF's analysis.  *See id.*  Likewise, in *United States v. Lewis*, the CAAF concluded there was an appearance of unlawful command influence "in light of the Government's conduct with respect to [the military judge who initially presided over the court-martial]."  63 M.J. 405, 415 (C.A.A.F. 2006).  The CAAF further noted that, had the Government's conduct that led to the military judge's recusal been "the subject of any ethical of disciplinary investigation or sanctions," that "could have had an impact on the public's perception" of the fairness of the military justice system.  *Id.* at 46 n.4.  There was no discussion of whether the public was in fact aware of the Government conduct that led to that military judge's recusal and whether the persons involved were subject to investigation or sanction based on that conduct.  *See id.*  Indeed, there is no reason to think that the public was aware of that court-martial at all.  Finally, underscoring the difficulties with any test that depended only on information actually known to the public:  there are cases—including the instant case—in which the information actually circulating among members of the public may be mistaken.

For all these reasons, the Court should reject the Plaintiff's argument that the CAAF erred in imputing to the objective, disinterested observer, full information about "all of the facts and circumstances" germane to the proceedings; the CAAF's analysis in this respect followed the well-established precedent requiring it to do just that.  In any event, it contained no error so "fundamental" that it could render the CAAF's judgment "void."  *See supra* 22–23.

> ### 2.   Plaintiff Errs in Arguing that the CAAF "Determined in the Absence of Evidence that No Convening Authority Would Have Granted Post-Trial Clemency Notwithstanding Strong Mitigating Evidence."

In assessing the clemency and appellate stages of the case, CAAF concluded "that the convening authority's decision not to exercise his discretionary clemency authority on behalf of [Plaintiff] was a foregone conclusion unaffected by any public comments made about the case." *Bergdahl*, 80 M.J. at 244.  Plaintiff asserts that the CAAF "determined in the absence of evidence that no convening authority would have granted post-trial clemency notwithstanding strong mitigating evidence." Am. Compl. ¶ 55(b).  In so arguing, Plaintiff misapprehends the CAAF's ruling and invites this Court to "simply re-evaluate the evidence," a course "not open to a federal civil court" where "a military decision has dealt fully and fairly" with the issue.  *Burns*, 346 U.S. at 142.  Moreover, although Plaintiff alleges an "absence of evidence," Am. Compl. ¶ 55(b), the CAAF's opinion cites ample justification for its holding.  As explained below, the Amended Complaint supplies no grounds on which to disturb the CAAF's well-reasoned decision on this issue.

To begin with, the CAAF did not find that "no convening authority would have granted post-trial clemency," *id.*, and the law does not support reframing the analysis in this way.  The test that the CAAF applied was to examine whether an "objective, disinterested observer" would "harbor a significant doubt about the fairness of the proceedings."  *Bergdahl*, 80 M.J. at 233, 234, 244 (quoting *Boyce*, 76 M.J. at 249).  The CAAF found that an objective, disinterested observer would not harbor such doubt; the question suggested by the formulation of the Amended Complaint—*i.e.* whether a different decision by the convening authority *could* be supported by the evidence—has no place in the analysis.

Indeed, Plaintiff's invitation to this Court to consider anew how to weigh the mitigation evidence, Am. Compl. ¶ 55(b), flies in the face of the precedent.  Even in a custodial case, where the least deferential standard applies, re-evaluating the evidence is foreclosed "when a military decision has dealt fully and fairly with an allegation raised in [an] application [for collateral relief]." *Burns*, 346 U.S. at 142.  A review of the CAAF's reasoning reveals, manifestly, that the court fully and fairly considered this issue.  Especially given the heightened deference due a decision of the CAAF regarding military law, *see supra* 23, Plaintiff supplies no reason to disturb the CAAF's judgment.  Furthermore, contrary to Plaintiff's contention that there was an "absence of evidence" supporting the CAAF's decision regarding clemency, the CAAF clearly identified four facts supporting its analysis.  An examination of each confirms the soundness of that court's conclusion:

**1.**  The CAAF cited that Plaintiff "pleaded guilty to deserting his unit with intent to shirk hazardous duty and of engaging in misbehavior before the enemy." *Bergdahl*, 80 M.J. at 244. Two points—the guilty plea and the nature of the offenses—are both significant to the CAAF's analysis of how an "objective, disinterested observer" would assess the convening authority's decision to leave Plaintiff's conviction and sentence intact.

As to the offenses, the CAAF was emphatic:  "[m]ake no mistake—these offense are very serious." *Id.* at 239 (noting both are punishable by death under certain circumstances); *id.* at 233 ("these offenses were anathema to the military and its mission"); *see also Homcy v. Resor*, 455 F.2d 1345, 1348 (D.C. Cir. 1971) (misbehavior before the enemy is "one of the most serious offenses that can be committed by a military man").  The military judge presiding over Plaintiff's court-martial explained:  "if a solider misbehaves before the enemy, he has violated the most basic aspect of who he is expected to be and what he is expected to do as a soldier."  Findings of Fact, Conclusions of Law and Ruling – Defense Motion to Dismiss – Failure to State an Offense (June 29, 2017), Ex. 12 hereto, at 5.  Because these crimes are unique to military life, the CAAF's assessment of their gravity is entitled to great weight. *See supra* 23.

With respect to the Plaintiff's plea, the CAAF reasoned: "it cannot be emphasized strongly enough that [he] *chose to plead guilty*." *Bergdahl*, 80 M.J. at 242 (emphasis the Court's). Under Article 45 of the Uniform Code of Military Justice ("UCMJ"), "[b]efore accepting a guilty plea, a military judge must conduct a thorough inquiry to insure the accused understands the meaning and effect of the plea, that he enters it voluntarily, and that he in fact is guilty of the offense." *Scott*, 351 F. Supp. 3d at 3. The details of that colloquy in this case are set forth above, *see supra* 11–12; as the CAAF observed, Plaintiff "explicitly agreed in open court that he was voluntarily pleading guilty *because he was in fact guilty* and not for any other reason." *Bergdahl*, 80 M.J. at 242 (emphasis the Court's).

There was no error, fundamental or otherwise, in the CAAF's consideration of the Plaintiff's guilty plea to two such serious offenses in assessing how an "objective, disinterested observer" would view the convening authority's not having granted post-trial clemency.

**2.** The CAAF next noted: "American servicemembers were injured searching for [Plaintiff] after he chose to desert his post in a combat zone." *Bergdahl*, 80 M.J. at 244. Although the Amended Complaint omits entirely the recovery efforts set in motion by Plaintiff's desertion, those operations and the grave injuries servicemembers suffered as a result formed the heart of the prosecution's presentation during the sentencing phase of his court-martial.

Several witnesses testified to the grueling, desperate operations that were triggered by the DUSTWUN alert that Mr. Bergdahl intentionally caused. *See supra* 15–16. As his battalion commander put it: "It was everybody, a hundred percent, all of the time, 24/7. The only time you slept was when you couldn't . . . stay conscious anymore." *See supra* 16. With the heightened pace came less time to plan, "significantly" greater engagement with the enemy, and increased risk to those involved. *See id.* Indeed, while many got sick, *see supra* 15–16, some suffered life-altering injuries. Senior Chief Hatch and then-Corporal Morita testified regarding their respective injuries and the difficult recovery process they had had to endure. *See supra* 16–17. Master Sergeant Mark Allen's injuries having left him unable to speak, his wife and doctor testified for him. *See surpa* 17–18. As the military judge concluded, none of the

- 29 -

servicemembers thus injured "would have been where they were, doing what they were doing, but for the actions of [Mr. Bergdahl]." Findings of Fact, Conclusions of Law and Ruling – Admissibility of Injury Evidence on Sentencing (June 30, 2017), Ex. 13 hereto, ¶ 7.

Notably, the CAAF assessed that the impact on military morale would have been "devastating" had the charges against Plaintiff gone only to a special court martial not empowered to adjudge a bad conduct discharge notwithstanding the "overwhelming evidence" that he committed the serious offenses at issue and that other servicemembers were injured in the efforts to rescue him. *Bergdahl*, 80 M.J. at 242[17]

While the Amended Complaint highlights that Plaintiff's preliminary hearing officer had recommended a more lenient approach than that which was ultimately taken in his case, Am. Compl. ¶ 46, Plaintiff omits that the hearing officer cited a lack of evidence that anyone was killed or wounded during the search and recovery efforts as "the 'strongest factor'" supporting his recommendation. *Bergdahl*, 80 M.J. at 240 (quoting preliminary hearing report). Indeed, the preliminary hearing officer "specifically opined . . . that 'the issue of casualties should be conclusively addressed prior to a final decision on the disposition of SGT Bergdahl's case.'" *Id.* That recommendation is consistent with Rule for Courts-Martial 1001, which provides that, during sentencing, a court-martial may consider testimony from those who "suffered direct . . . harm as a result of the commission of an offense of which the accused was found guilty" regarding the "impact on [them] directly relating to or arising from the offense." R.C.M. 1001(c)(2)(B).

Especially in light of this guidance, it was fair for the CAAF to consider that others were injured searching for Plaintiff when assessing an objective observer's views on the issue of clemency. Thus, as to this step of the CAAF's analysis, there was no error, fundamental or otherwise.

---

[17] As with the CAAF's assessment of the gravity of the offenses, that court's judgment regarding military morale, too, is entitled to great weight. *See supra* 23.

**3.**  The CAAF also weighed in its analysis that "the United States government was required to exchange five members of the Taliban who had been held at the U.S. detention facility in Guantanamo Bay, Cuba, in order to secure [Plaintiff's] release." *Bergdahl*, 80 M.J. at 244.  Those members of the Taliban had been detained under the Authorization for Use of Military Force (the "AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), the same authority under which the United States was then—as it remains now—engaged in armed conflict.  As the plurality explained in *Hamdi v. Rumsfeld*, the purpose of detention in such cases was "to prevent a combatant's return to the battlefield." 542 U.S. 507, 519 (2004) (plurality opinion); *see also Boumediene v. Bush,* 553 U.S. 723, 795 (2008) (referring to "the dangers the detention in these cases was intended to prevent").  The CAAF thus was highlighting that, as a result of Plaintiff's offense, five members of enemy forces were released back onto the battlefield during an armed conflict.  It is reasonable that this direct result of Plaintiff's offense be considered in assessing whether it was fair that the convening authority declined to exercise discretionary clemency in this case.  Moreover, given that this factor—release of enemy combatants onto the battlefield—constitutes a uniquely military consideration, this Court should give significant weight to the CAAF's assessment of its import.  *See supra* 23.

**4.**  Finally, the CAAF observed that, despite the three aggravating factors discussed above, the military judge "imposed as a sentence only a dishonorable discharge, a reduction in rank, and partial forfeitures of pay after [Plaintiff] specifically asked to receive a dishonorable discharge," implying that, in context, the sentence was already quite lenient.

Indeed, although the Amended Complaint notes that "[a] dishonorable discharge is highly stigmatizing," Am. Compl. ¶ 21, a review of case law addressing desertion reveals that a dishonorable discharge is frequently adjudged in such cases.  Even where the desertion causes neither injuries to other servicemembers nor the release of enemy combatants into theater, persons convicted of desertion often are sentenced to a period of confinement in addition to the dishonorable discharge of which Plaintiff complains.  *See, e.g.*, *United States v. Lemburg*, 2018 WL 4440397, at *1 (A.F. Ct. Crim. App. Aug. 30, 2018) (affirming dishonorable discharge and

30 days confinement pursuant to a pretrial agreement—although the accused had been sentenced to 15 years—where the accused failed to report to his detachment in Pennsylvania just months before he was due to separate from the Air Force).[18]   A comparison with such cases—where dishonorable discharge *and* confinement were adjudged although the consequences of desertion were not nearly so grave as in this case—gives further context to the CAAF's assessment that "an objective, disinterested observer would decide that the convening authority's decision not to exercise his discretionary clemency authority on behalf of [Plaintiff] was a foregone conclusion unaffected by any public comments made about the case." *Bergdahl*, 80 M.J. at 244.

Furthermore, although the Amended Complaint cites the "strong mitigating evidence" in challenging the CAAF's conclusion about clemency in this case, Am. Compl. ¶ 55(b), the CAAF's opinion carefully considered that evidence and found that it "[did] not overcome" that court's "firm conviction" regarding the fairness of Plaintiff's sentence. *Bergdahl*, 80 M.J. at 243.   The CAAF extensively delved into what it described as "significant mitigation evidence" that Plaintiff presented during sentencing, including that the sanity board concluded that he was "suffering from a severe mental health disease or defect" and that the preliminary hearing officer reported there is "almost unanimous agreement that SGT Bergdahl left [his post] with good, albeit misguided, motives." *Id.* at 242–43.   More than that, the CAAF discussed in such detail the "compelling evidence" that Plaintiff presented regarding the "brutal and persistent physical and psychological torture" that he suffered at the hands of the Taliban, *id.* at 243, that the

---

[18] *See also, e.g.*, *United States v. Benavides*, 57 M.J. 550, 551 (A.F. Ct. Crim. App. June 13, 2002) (affirming sentence of dishonorable discharge and confinement for 102 days where the accused failed to report for work in Oklahoma following the completion of his training), *review denied* 57 M.J. 477 (A.F. Ct. Crim. App. Nov. 13, 2002); *Unites States v. Maury*, 2004 WL 2191714 (A.F. Ct. Crim. App. Sep. 14, 2004) (affirming sentence of dishonorable discharge and confinement for 9 months where the accused pleaded guilty to desertion after he failed to report for duty in Florida and flew to Alabama and then Aruba instead); *United States v. Wert*, 2010 WL 4069039 (A.F. Ct. Crim. App. Jan. 19, 2010) (affirming sentence of dishonorable discharge, total forfeiture of pay, and confinement for 24 months where the accused missed his deployment to Iraq; was absent in desertion for less than one month; and also was convicted of wrongful appropriation for taking a car from a dealership but not paying for it); *United States v. Etibek*, 2007 WL 7263001 (Army Ct. Crim. App. Mar. 29, 2007) (affirming sentence of dishonorable discharge, total forfeiture of pay, and confinement for 12 months where the accused was convicted of desertion and missing movement); *United States v. Swanholm*, 36 M.J. 743 (A.C.M.R. 1992) (affirming sentence of dishonorable discharge, total forfeiture of pay, and confinement for 6 months where the accused was convicted of desertion and missing movement because, as a member of a reserve unit, she failed had to report for active duty when her unit was mobilized in Minnesota).

Plaintiff's presentation of that evidence in the Amended Complaint tracks the CAAF's discussion almost verbatim.  *Compare* Am. Coml. ¶¶ 7–14 *with Bergdahl*, 80 M.J. at 243. Plaintiff's use of only that description in presenting the same facts in his Amended Complaint reinforces the CAAF's thoroughness, as well as the accuracy of the factual findings underlying its analysis.  Similarly, Plaintiff's description in the Amended Complaint of the intelligence that he provided upon his return to military custody mirrors the language found in the CAAF's opinion, once again demonstrating that the CAAF thoroughly considered the relevant mitigation evidence, the description in the Amended Complaint mirrors the language found in the CAAF's opinion.  *Compare* Am. Coml. ¶¶ 16–18 *with Bergdahl*, 80 M.J. at 243.

Having considered the above-discussed material, the CAAF concluded that "this mitigation evidence does not overcome our firm conviction that the sentence adjudged in this case had nothing to do with the comments made by Senator McCain or President Trump and was instead based solely on the serious offenses to which [Plaintiff] pleaded guilty and on the facts established during the Government's case in aggravation."  *Bergdahl*, 80 M.J. at 243.  The CAAF emphasized that "*fully aware of his own case in mitigation*, [Plaintiff] *specifically recognized that he was deserving of punishment and asked to have a dishonorable discharge imposed upon him*."  *Id.* (emphasis the Court's).

Based on all these considerations, and further noting that there was no formal request for clemency in the form of a sentence reduction, *id.* at 244, the CAAF concluded that "an objective, disinterested observer would not harbor a significant doubt about the fairness of these proceedings."  *Id.* (citation omitted).  Because a review of that court's reasoning reveals that it fully and fairly addressed this issue, the collateral relief that Plaintiff seeks is barred.

III.    **The Court Should Dismiss Plaintiff's Claim Grounded in the Military Judge's Employment Application.**

Plaintiff's second claim, the allegation that the military judge failed to disclose a disqualifying conflict, Am. Compl. ¶¶ 79–82, likewise provides no basis on which to disturb Plaintiff's conviction and sentence.  Plaintiff failed to timely raise this issue during the direct appeal of his case, and the ACCA fully and fairly considered his argument and effectively found that the issue had been waived.  In light of that decision, the collateral relief that Plaintiff seeks is barred.  Moreover, even if the Court were to reach the merits of Plaintiff's argument, this claim would not support the relief that he seeks.

A.    **The Military Court Thoroughly Considered Plaintiff's Claim that the Military Judge Failed to Disclose a Basis for Disqualification.**

As explained above, in a noncustodial setting, collateral relief from the military court's judgment is barred unless these is a "fundamental error" rendering that judgment void.  *See supra* 22.  Any decision by the military court that fully and fairly considered a claim cannot be said to suffer such a fundamental flaw.  *See id.*  Even the summary disposition of an issue constitutes full consideration if that issue was briefed and argued by the parties.  *Sanford v. United States*, 567 F. Supp. 2d 114, 118 (D.D.C. 2008) ("As a general rule, the thorough consideration component of a court's analysis is 'established when [an issue] is briefed and argued by the parties, even if the judgment summarily disposes of the issue.'") (quoting *Oppermann v. United States*, 2007 WL 1748920, at *6 (D.D.C. June 15, 2007)).  Here, the ACCA fully and fairly considered the Plaintiff's argument that the military judge improperly failed to disclose his application for employment with DOJ, and it correctly rejected the argument because it found that there was no valid reason for Plaintiff's having failed to raise the issue earlier.  This alone forecloses the relief that Plaintiff seeks.

Plaintiff first raised his argument that the military judge failed to disclose a disqualifying conflict almost two years after the DOJ released a public notice announcing that the military judge had been sworn in as an immigration judge; after the CAAF had issued its decision affirming Plaintiff's sentence and conviction on August 27, 2020; and after Plaintiff moved for

reconsideration of that decision on September 7, 2020.  Indeed, it was not until September 18, 2020, that Plaintiff moved to supplement the record with the military judge's application and affiliated documents.  The CAAF denied Plaintiff's request without prejudice to his right to seek a writ of error coram nobis.  *See United States v. Bergdahl*, 80 M.J. 362 (C.A.A.F. 2020).

Plaintiff filed his Petition for a Writ of Error Coram Nobis before the ACCA on October 23, 2020, arguing that the military judge's job application, taken with the rest of the record, undermined the CAAF's decision on apparent unlawful command influence and asserting the same arguments now advanced in the Amended Complaint as to the military judge's duty to disclose the application and the alleged impact on Plaintiff.  *Compare* Pet. for a Writ of Error Coram Nobis, Dkt No. ARMY MISC 20200588, Ex. 14 hereto, at 11–13, *with* Am. Compl. ¶¶ 80–82.  The Government submitted a 28-page opposition to that petition, arguing that the Plaintiff did not meet the threshold requirements for the writ, and that the Plaintiff's substantive arguments failed on the merits.  *See* Answer to the Pet. for a Writ of Coram Nobis, Dkt No. ARMY MISC 20200588, Ex.15 hereto.  Plaintiff responded with a 20-page reply, presenting argument supporting the timing of his petition as well as the merits of his claims.  *See* Petr's Reply to Answer to Pet., Dkt No. ARMY MISC 20200588, Ex. 16 hereto.   Two law professors, as *amici*, submitted an additional 35 pages, providing still further argument in support of Plaintiff's position that the military judge's not having disclosed his application denied Plaintiff a fair trial.  *See* Br. on Behalf of *Amicus Curiae*, Dkt No. ARMY MISC 20200588, Ex. 17 hereto.

Having received extensive argument on the issue from the parties as well as *amici*, the ACCA concluded that Plaintiff had failed to meet the threshold requirements for coram nobis review because the fact of the military judge's employment with DOJ had been public for nearly two years before Plaintiff raised the issue of a potential conflict.  *Bergdahl v. United States*, 2020 WL 7316058 (A. Ct. Crim. App. Dec. 11, 2020).  The military court's decision, discussed in detail below, confirms that it fully considered the Plaintiff's claim.  As noted in the Amended

Complaint, following the ACCA's denial of his petition, Plaintiff sought reconsideration before

the CAAF, and the CAAF summarily denied that request.  Am. Compl. ¶¶ 30–31.

> **B.   There Are No Grounds on Which to Disturb the Military Court's Determination that Plaintiff Effectively Waived the Issue of the Military Judge's Employment Application by Waiting Nearly Two Years After the Public Announcement of his Employment to Raise the Issue.**

The record further establishes that the Army Court of Criminal Appeals fairly considered

Plaintiff's claim regarding the military judge's employment application, and there is no error,

fundamental or otherwise, in its decision.  That court was guided by Supreme Court precedent

describing coram nobis as permitting "'continuation of litigation after final judgment' . . . but

only under very limited circumstances."  *Id.* at *2 (quoting *United States v. Morgan*, 346 U.S.

502, 511–12 (1954)).  Framing its analysis using the criteria identified by the Supreme Court as

prerequisites for a petitioner to obtain coram nobis review, the court focused on the third of those

criteria:  that "valid reasons [must] exist for not seeking relief earlier."  *Id.* at *2 (citing *Denedo*

*v. United States*, 66 M.J. 114, 126 (C.A.A.F. 2008) (citing *Morgan*, 346 U.S. at 512–13)).

The court concluded that Plaintiff failed to meet this requirement.  *Id.* at *3.  The court

considered Plaintiff's proffered explanations but observed that they "[did] not clarify why

petitioner did not request the military judge's employment application earlier, and why he did

not raise this issue at [the ACCA] on direct appeal."  *Id.*  Focusing on the timeline of events, the

court noted the military judge's employment became public on September 28, 2018, early in the

pendency of Plaintiff's direct appeal.  *See id.* at *1, 3–5.  After that public announcement, ten

months passed during which Plaintiff submitted two briefs claiming five errors, "none of which

alluded to any concerns with the military judge seeking employment as an immigration judge."

*Id.* at *3.  Nor did Plaintiff request the judge's employment application; rather, the court

observed, he waited until the CAAF had denied relief in his direct appeal.  *Id.*

The court considered and rejected as an explanation for Plaintiff's delay his argument

that "the full import of the matter did not become clear until April 16, 2019, when *In re Al-

Nashiri* was decided."  *Id.* at *4.  The court observed that the issue "was a known appellate

issue" either as of the date of the public announcement of the military judge's employment, "or

- 36 -

at least when Al-Nashiri submitted his pleadings challenging the judge in his case." *Id.*  The court pointed to clear evidence that Plaintiff's counsel would have been aware of the issue—namely, that one of the Plaintiff's counsel also submitted a brief for *amicus curiae* in *Al-Nashiri*. Moreover, the DOJ announcement at issue in *Al-Nashiri*—which  made public that the military judge from *that* case had had his investiture as an immigration judge—is the same DOJ announcement that made public the investiture of the military judge who presided over *Plaintiff's* court-martial.  *Id.* at \*4 n.6.  The court found that, even if the court were to accept April 2019 as the date on which "the full import of the matter" became clear to Plaintiff, "there [was] no adequate explanation" for his not having raised the issue for another fourteen months. *Id.*

The court relied on *United States v. Kates*, 2014 CCA LEXIS 360 (A.F. Ct. Crim. App. June 17, 2014), a case in which the petitioner was convicted; had his conviction affirmed; but then sought relief from the conviction after a decision in another case invalidated the appointment of one of the judges who had affirmed the conviction.  *See Bergdahl*, 2020 WL 7316058, at \*3.  As the ACCA explained, the court in *Kates* rejected the petition because the invalidated appointment was "very much at issue in appellate litigation" during the direct appeal of petitioner's conviction, and therefore could have been raised there.  *Id.* at \*3.  The ACCA reasoned that Plaintiff likewise had a "meaningful opportunity" to raise the issue of the military judge's employment application, and his failure to timely do so rendered relief unavailable.  *Id.* at \*4.

Especially given that the court closely hewed to Supreme Court precedent, there is no error, fundamental or otherwise in the court's decision.  Thus, the collateral relief Plaintiff seeks is barred, and this Court should dismiss Count II for this reason alone.

### C.  Count II Also Fails on Its Merits.

On its merits, Count II would fare no better.  For the reasons explained in Section I.B, binding precedent precludes such review.  But if the Court were to consider the merits of this claim, Plaintiff nonetheless would not be entitled to relief.

### 1.  Legal Standard

"Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *Al-Nashiri*, 921 F.3d at 233–34.  For this reason, "jurists must avoid even the appearance of partiality." *Id.* at 234.  Rule 902 of the Rules for Courts-Martial provides that a judge "shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned."  R.C.M. 902(a).  Expounding on that rule, the D.C. Circuit noted "it is beyond question that judges may not adjudicate cases involving their prospective employers." *Al-Nashiri*, 921 F.3d at 235.  Relatedly, Rule 902(b) provides that "a military judge shall also disqualify himself or herself" when that judge has "an interest, financial or otherwise, that could be substantially affected by the outcome of the proceeding."

Disqualification is determined by applying an objective standard, guided by "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015).  Put another way, "the test is whether, taken as a whole in the context of this trial, a court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions." *United States v. Martinez*, 70 M.J. 154, 158 (C.A.A.F. 2011).  "There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted).  "Although [the] military judge is to broadly construe the grounds for challenge, he should not leave the case unnecessarily." *United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015) (citation omitted).  Indeed, "a judge has as much obligation not to disqualify himself when there is no reason to do so as he does to disqualify himself when the converse is true." *United States v. Kincheloe*, 14 M.J. 50 n.14 (C.M.A. 1982).

### 2.  This Case is Distinguishable from *Al-Nashiri*, and an Objective Observer Knowing All the Circumstances Would Not Question the Military Judge's Impartiality.

Plaintiff frames his second claim with reference to *Al-Nashiri*, a case in which the D.C. Circuit held that a military judge's job application to DOJ had created the appearance of

partiality in the military commission proceedings over which he presided.  *See* Am. Compl., Introduction (citing *In re Al-Nashiri*, 921 F.3d 224 (D.C. Cir. 2019).  Indeed, Plaintiff argued to the military appellate court that he did not understand "the full import" of the military judge's job application in this case until the *Al-Nashiri* decision issued.  *See supra*.  But the D.C. Circuit's reasoning in *Al-Nashiri* focused on the DOJ's role in those military commission proceedings.  Since DOJ had no role in the Plaintiff's court-martial, *Al-Nashiri* is inapposite here; in fact, two cases have already distinguished that decision from the court-martial context.

More broadly, "taken as a whole in the context of this trial," the court-martial's "legality, fairness, and impartiality" were not "put into doubt by the military judge's actions," *Martinez*, 70 M.J. at 157.  The military judge's application demonstrates—on its face—that he was impervious to outside forces, since the writing sample that he appended to his application criticized the President's comments about Mr. Bergdahl's case.  Indeed, following that decision, even Mr. Bergdahl's counsel recognized that "the White House" would be "aware of the dim view the Court took of President Trump's pre-inauguration statements about Sergeant Bergdahl."  Tr. at 1732:15–19.  In light of the fact that the military judge's decision was overtly critical of President Trump's comments, as well as the judge's efforts to ensure that "comments by Mr. Trump do not invade this trial," an objective observer would not question the court-martial's legality, fairness, and impartiality.  Nor would the judge's comments about his retirement cause concern, since it is apparent from the context that he was addressing the question of how long he would be subject to military command.  Indeed, an objective observer—considering the scrupulous fairness of the military judge throughout the proceedings and the manifest leniency of the sentence he ultimately imposed—would have no doubt about the military judge's impartiality.

### a.  Plaintiff Errs in Analogizing to *Al-Nashiri*.

The guiding principle in *Al-Nashiri* was that "judges may not adjudicate cases involving their prospective employers," and the key question was "whether [the military judge's] prospective employer was a party to Al-Nashiri's [military commission] case such that it 'would

appear to a reasonable person knowing all the circumstances that [the military judge's] impartiality was in jeopardy.'" *In re Al-Nashiri*, 921 F.3d at 235. Thus, "[t]he core of the [D.C. Circuit's] analysis focused on the DOJ's involvement in the military commission system and that the DOJ 'detailed one of its lawyers to prosecute Al-Nashiri.'" *Bergdahl*, 2020 WL 7316058, at *4 n.5 (citing *In re Al-Nashiri*, 921 F.3d at 236).

In two recent cases, the Air Force Court of Criminal Appeals declined to extend *Al-Nashiri*'s holding to court-martial proceedings in which DOJ played no role. Those cases both addressed claims that the same military judge whose employment application was at issue in *Al-Nashiri* had an obligation to disclose that application during the pendency of court-martial proceedings. *See United States v. Wilson*, 2021 WL 2390367, at *11–14 (A.F. Ct. Crim. App. June 10, 2021); *United States v. Snyder*, 2020 WL 1896341, at *19–22 (A.F. Ct. Crim. App. Apr. 15, 2020), *review denied by* 80 M.J. 399, (C.A.A.F. 2020), *reconsideration denied by* 81 M.J. 136 (C.A.A.F. 2021). In *Wilson*, the accused had been convicted of murder and sentenced to confinement for life without eligibility for parole. *See Wilson*, 2021 WL 2390367 at *1. The military judge's employment application alluded to his role as presiding judge in the capital murder trial of an Air Force member. *See id.* at *11. The accused argued that the military judge relied on his experience in capital cases "to compensate for his lack of experience in immigration law," and cited adverse rulings by the judge on motions that would have dismissed the charges or prevented imposition of the death penalty. *Id.* at *12. The military court rejected this argument, reasoning "[t]he core problem in *Al-Nashiri* was that Judge Spath sought employment with the DOJ when the DOJ was directly involved in the ongoing *Al-Nashiri* prosecution—in other words, he was adjudicating a case involving his prospective employer." *Id.* at *13. "In contrast," the military court observed, "the DOJ was not a party or participant in [the] court-martial . . . and it had no discernible interest in the outcome." *Id.* at *13 ("nothing included in the application implied [the judge] would be biased with respect to the outcome of [the] trial.").

Likewise, in *Snyder*, a case that Plaintiff described as addressing "a similar issue" to the one presented here, Reply to Am. Answer to Mot. to Suppl. the Record, USCA Dkt. No. 19-

0406/AR, Ex. 18 hereto, at 2, the court distinguished *Al-Nashiri*. *Snyder*, 2020 WL 1896341, at *21 (observing that "[t]he DOJ was not a party to Appellant's trial and did not have an identifiable interest in its result, nor was the Attorney General or anyone in the DOJ a participant. Neither the DOJ nor the Attorney General has a close association with military court-martial generally, or Appellant's case specifically."). As to a particular ruling that the accused in *Snyder* had argued reflected alleged bias, the court assessed "[t]here is no reason to believe that a DoJ hiring official would hear about the ruling and be pleased or displeased, or that Judge Spath believed a DoJ hiring official would be aware of his ruling or that it would be a matter of any consequence." *Id.*

Like *Wilson* and *Snyder*, the instant case is distinguishable from *Al-Nashiri*. The DOJ played no institutional role in these proceedings, and DOJ attorneys were not detailed to Plaintiff's trial.[19] Plaintiff may object that, unlike in *Snyder*, DOJ hiring officials would be aware of at least one of the military judge's rulings in this case, since he included a decision from Plaintiff's court-martial in his application. Yet far from giving the objective observer reason to doubt his impartiality, that ruling—like his conduct throughout the proceedings—demonstrates the military judge's independence.

### b. The Military Judge's Actions Supply No Reason to Question his Impartiality.

Neither the military judge's employment application, nor his conduct of the trial, nor the outcome in this case supplies any reason to question his impartiality.

### i. Employment Application

First, the contents of the military judge's application actually demonstrate his independence. In that application, the judge appended his February 24, 2017 decision on unlawful command influence as a writing sample. Although the military judge denied the plaintiff's motion in that decision, he criticized the President's comments and made clear that

---

[19] When a third party from whom the court-martial trial counsel sought information sued several Government officials, including trial counsel, in federal court, the DOJ represented the defendants. However, the DOJ's role was limited to defense in that collateral litigation, and the DOJ had no involvement in the court-martial proceedings.

they would have no impact on the proceedings, writing: "The Court will take special care to ensure that comments by Mr. Trump do not invade this trial." *See* Feb. 24, 2017 UCI Decision, ¶ 13. To that end, he described therein voir dire measures that he intended to implement so that "the reasonable member of the public will have no doubt that the accused has received a fair trial, *uninfluenced by Mr. Trump's comments*." *Id.* (emphasis added). More than that, the military judge referred to the President's remarks as "troubling," "disturbing," and "disappointing," *see id.* ¶ 11, and Mr. Bergdahl's counsel noted, following that decision, that "the White House . . . [would have been] long aware of the dim view the Court took of President Trump's pre-inauguration statements about Sergeant Bergdahl." Tr. at 1732:15–19.

Just as the application itself supplies no reason to question the judge's impartiality, nor does the judge's description of his plans. As Plaintiff acknowledges, the military judge's comments regarding his plans to retire came in the context of a discussion of unlawful command influence, Am. Compl. ¶ 68, a question that arises only in the context of military life. As the military judge wrote in his second decision addressing the issue: "UCI is unique because the command nature of the military makes interference or the appearance of interference with the criminal justice system particularly devastating and pernicious." Feb. 24, 2017 UCI Decision, ¶ 8. From the face of the record, then, it is evident that—with the conversation having been directed at the susceptibility of the military judge to this uniquely military issue—his comments, including a description of his employment plans, are most reasonably understood as explaining why he was not subject to any unlawful command influence while he was in the military.

### ii. Further Evidence of Independence

The independence of the military judge was evident throughout the court-martial proceedings. On multiple occasions, the military judge openly criticized the President. When the defense sought to play a video of the President's remarks about Mr. Bergdahl, the military judge hesitated saying he did not want "to further . . . perpetuate this disturbing material." Tr. at 1071:17–20. He referred to the President, as a candidate, "ranting and raving about no jail time [for Mr. Bergdahl], *id.* at 1098:18–1099:2 (questioning the prosecution about whether they were

- 42 -

"disturbed" by such remarks), and questioned whether the President was getting his facts about the case through "fake news or some other thing he[] [was] misinterpreting", *id.* at 1099:5–8. Later, commenting on the President's October 17, 2017 statement, the military judge observed that the President went on to talk about the case and refer back to "things he's said before," "in spite of the . . . initial acknowledgement that he shouldn't say anything." *Id.* at 1739:19–1740:3.

And, as in his February 24, 2017 decision, the military judge continued to express that the President's remarks would have no impact on him. *See id.* at 1757:6–7 ("I'm not influenced by these matters in the least and certainly not in a negative way towards Sergeant Bergdahl."); Oct. 30, 2017 UCI Decision, ¶ 6(i) (writing that he was "completely unaffected by any opinions President Trump may have about SGT Bergdahl"). Indeed, he made clear that he was avoiding exposure to news coverage about the case and was made aware of the remarks only through Mr. Bergdahl's submissions. *See* Oct. 20, 2017 UCI Decision, ¶ 6(i); *see also* Tr. at 1723:12–19.

Furthermore, the military judge introduced several procedural safeguards. As discussed in his February 24, 2017 decision, he provided for extensive voir dire of potential panel members. *See supra* 10. In the course of crafting the potential panel questionnaire, he noted that he was "obviously . . . inclined in [the defense's] favor" as to the questions they sought to ask. Tr. at 1296:1–4. Ultimately, defense counsel thanked him for his changes to the proposed questions saying, "I think [the changes are] going to help us get at the truth." *Id.* at 1376:20– 1377:2. After the question of alleged unlawful command influence arose again, he indicated that he would require anyone involved in post-trial aspects of the case to read the White House statement that indicated the President expected officials in the military justice system to "use [their] own discretion and judgment to do what [they] think it right under the law," and ultimately held that he would "consider the President's comments as mitigation evidence." Oct. 30, 2017 UCI Decision, ¶ 6(i); *see also* Tr. at 2585:16–17 (noting, during sentencing proceedings, he would consider a video of the President's comments on the campaign trail "for the purposes of mitigation."). In other words, he would consider the calls for harsh punishment to be a reason for leniency. This public announcement that he planned to do the opposite of what

the President's remarks called for would confirm to an objective observer that the military judge was independent and impartial in this case.

### iii. Conduct of the Court-Martial

More broadly, throughout the proceedings, the military judge was scrupulously fair to the defense. *See supra* 7–8. This, too, distinguishes *Al-Nashiri* from the instant case. There, the military judge consistently ruled against the defense and ultimately left the defendant without learned counsel in a death penalty case. *See In re Al-Nashiri*, 921 F.3d at 228–231. He "became increasingly frustrated with defense counsel," *id.* at 230, and even directed that writs of attachment for their arrest be prepared, *id.* at 231.

By contrast, here, the military judge was fair and even abundantly solicitous in his treatment of the defense. He repeatedly sought to alleviate the burdens of discovery on the defense, and he sought to ensure that they would have adequate time to prepare for trial and an opportunity to advance any argument they wished the court to consider. *See supra* 7–8 (citing a dozen examples from the record). He emphasized that Mr. Bergdahl was innocent until proven guilty; denied a motion to introduce evidence of injuries that could be prejudicial to the finder of fact; and even admonished the prosecution not to gratuitously refer to Mr. Bergdahl as a "deserter" in their submissions. *See supra* 8. Indeed, more than once—including during argument on an unlawful command influence motion—the defense had occasion to thank the military judge for the way he conducted proceedings. *See* Tr. at 513:4 (noting he had been "very generous" in permitting so much time for defense argument); *id.* at 1376:20–1377:2 (expressing "appreciation for [his] craftsmanship" in the changes to the proposed panel questionnaire).

Simply put, the judge's conduct supplies no basis to question his impartiality.

### iv. Outcome of the Court-Martial

If further evidence were needed that the military judge was fair and independent, the CAAF has closely reviewed the record and concluded that the result in this case "stands as a testament to the strength and independence of the military justice system." *See supra* 2, 27–33. The CAAF conducted its analysis through the prism of the test for apparent unlawful command

influence, but that standard is similar to the test applied in reviewing challenges to military judges for an appearance of a conflict of interest.  *Boyce*, 76 M.J. at 248.  Thus, the CAAF's assessment that "an objective, disinterested observer would conclude that rather than being swayed by outside forces, the military judge was notably impervious to them," *Bergdahl*, 80 M.J. at 244, supplies important guidance as to Count II.  The CAAF underscored that "despite the sensational nature of this case, despite the public calls for the lengthy imprisonment of [Mr. Bergdahl], despite Senator McCain's threat that he would hold a hearing if Appellant did not receive a sentence to his liking, and despite the Commander in Chief's ratification of his statements that [Mr. Bergdahl] was a traitor who should be severely punished, the military judge imposed on [Mr. Bergdahl] *no prison time whatsoever*." *Id.*  Indeed, the military judge imposed the very sentence that Plaintiff requested.[20]

That sentence was immediately and publicly condemned by the President who called it a "complete and total disgrace."  Am. Compl. ¶ 52.  From the perspective of an objective observer, then, the military judge's sentence was flatly inconsistent with the President's sentiments about the case.  At a minimum, it demonstrates the judge's impartiality and the fulfillment of his promise to "take special care to ensure that comments by Mr. Trump do not invade this trial."

Moreover, as to the only portion of the charges ultimately contested in this case, the military judge acquitted Mr. Bergdahl.  *See supra* 13.

In sum, by word and deed, the military judge showed himself to be fair and independent.  "There is a strong presumption that a judge is impartial," *Quintanilla*, 56 M.J. at 44, but—even if there were not—on this record, Count II would fail on its merits.

## CONCLUSION

For all the reasons explained herein, the Court should dismiss the Amended Complaint in its entirety and enter judgment for the Defendant.

---

[20] As noted above, by operation of law, a punitive discharge automatically results in a reduction to E-1.  *See supra* 20 n.15 (citing 10 U.S.C. § 858a; Army Reg. 27-10, ¶ 5-38).

Dated: August 2, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director

 */s/ Julia A. Heiman*

JULIA A. HEIMAN (D.C. Bar No. 986228)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 616-8480
Fax: (202) 616-8470